No. 92-418

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

CRAIG S. LUECK,

    Plaintiff and Appellant,

-vs-

UNITED PARCEL SERVICE,

    Defendant and Respondent.

FILED

APR 13 1993

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Seventh Judicial District,
In and for the County of Dawson,
The Honorable Dale Cox, Judge presiding.


COUNSEL OF RECORD:

    For Appellant:

        Michael G. Eiselein; Lynaugh, Fitzgerald, Eiselein
& Eakin, Billings, Montana

    For Respondent:

        Steven Lehman and Chris Mangen, Jr.; Crowley,
Haughey, Hanson, Toole & Dietrich, Billings, Montana


Submitted on Briefs:   January 7, 1993

Decided:   April 13, 1993

Filed:

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from the Seventh Judicial District, Dawson County, the Honorable Dale Cox presiding. Appellant Craig Lueck (Lueck) appeals from an order granting summary judgment in favor of respondent United Parcel Service (UPS) and dismissing his retaliatory discharge complaint. We affirm.

UPS hired Lueck as a part time delivery driver on April 16, 1984. He joined the Teamsters Union shortly after he was hired. In June 1986, Lueck became a full time driver, driving a tractor-trailer combination on a "swing run" three nights and one day per week. After driving on this schedule for approximately twenty months, Lueck was given a new route in February 1988, from Glendive to Wolf Point on a regular schedule. Another driver, who had more seniority than Lueck, bid for and got Lueck's swing run.

UPS discontinued the Glendive-Wolf Point run after only one week, and Lueck went back to part time driving. Around May 1, 1988, the driver who had taken Lueck's swing run took another position with UPS and Lueck took over the swing run again. By then, however, it had been changed.

The revised swing run followed a schedule Lueck describes as "bizarre." It began at 1:00 p.m. on Sunday, when Lueck was scheduled to drive from Glendive to Billings, returning at approximately 2:00 a.m. on Monday morning. On Monday evening at 7:00 he was scheduled to drive to Bismarck, returning at approximately 8:00 on Tuesday morning. On Wednesday he was scheduled to begin driving at 6:45 a.m., returning at approximately

2

7:00 that evening, and on Thursday, he was scheduled to begin driving at 8:30 p.m., returning at 9:00 on Friday morning.

After his first week on this schedule Lueck complained about lack of sleep. He spoke to his supervisors on three separate occasions, indicating that he was having serious problems and was unable to sleep. On June 9, 1988, Lueck reported to work at the UPS Center in Glendive and put on his uniform in preparation for leaving on the evening's run. At that point he "flipped out," as he describes it, and went home without doing the run. His doctor prescribed anti-depressants and admitted him to Glendive Community Hospital for treatment over the weekend of June 11-12, 1988. He was then referred to the Eastern Montana Mental Health Center for outpatient counselling.

Don LaPlante, a counselor at the mental health center, described Lueck's "presenting problem" as a "physical/psychological adverse stress reaction to working swing shifts as a truck driver for UPS" and recommended continuing anti-depressant medication as well as counselling. Lueck's family physician, Dr. J.E. Harkness, a Glendive osteopath, saw him in June 1988 and again on July 13, 1988, when he reported that although Lueck appeared to be considerably improved, "it's unlikely that he will be able to go back into such a swing shift as it was a direct causal effect of his acute hysterical depression episodes." In fact, Lueck never returned to work for UPS.

On July 25, 1988, Lueck filed a claim for compensation with the Montana Division of Workers' Compensation, stating that his

3

"double swing" work schedule had disrupted his sleeping and eating patterns, leading to severe physical fatigue, loss of weight, ringing in the ears, dizziness, headaches, nervousness and insomnia. This claim was denied by UPS's insurer on August 24, 1988, on the grounds that Lueck's condition was not compensable under the 1987 Workers' Compensation Act. Lueck never appealed the denial of his claim.

Lueck also filed a claim under his credit disability insurance policy in July 1988. Dr. Harkness completed the required attending physician's statement on July 20, 1988, describing Lueck's current condition as "acute anxiety -- hysteria, stress reaction, depression" and adding as a "remark" that Lueck "cannot do that type of shift switch work again."

Lueck occasionally played guitar with a band on weekend nights during the spring of 1988, until he became ill in June. In October 1988 he again began playing with a band. On October 6, 1988, he filed a claim for disability benefits under a Teamsters Union insurance policy, but he never received any benefits because he had begun working in the band before the payments began. In connection with Lueck's Teamsters Union claim, Dr. Harkness completed a physician's statement indicating that October 11, 1988, was the "date patient able to return to work."

In November 1988, UPS learned that Lueck had started working again in a band, that he was not receiving benefits through the Teamsters Union, and that Dr. Harkness had approved his return to work on October 11, 1988. Joe Kriskovich, a Billings UPS manager,

4

called Lueck at home on December 8, 1988, to verify this information and to ask why he had not returned to work for UPS. Lueck explained that Dr. Harkness had said that he could not return to the swing shift schedule. Kriskovich told Lueck that UPS had nothing in its files to document this statement. Later on the same day, Lueck took a copy of the statement Dr. Harkness signed as attending physician on July 20, 1988, indicating that Lueck "cannot do that type of shift switch work again," to his supervisor in Glendive, for delivery to Kriskovich the next day.

In the meantime, Kriskovich wrote Lueck a letter, dated December 8, 1988, telling him that he was no longer on authorized leave, that he was scheduled to return to work on Sunday, December 11, 1988, and that his employment at UPS "could be terminated" if he did not return to work on December 11. Lueck did not communicate with UPS or return to work, and on December 12 he received a mailgram and a telegram from the UPS division manager in Billings, telling him that if he did not return to his regularly scheduled shift on Monday, December 12, his name would be removed from the employment records. Lueck again did not communicate with UPS or return to work, and on December 13 the division manager sent him an official separation letter terminating his UPS employment.

Asked during his deposition why he ignored these messages from UPS, Lueck said:

> It was just inconceivable to me that they could have received this, that says I cannot return to the shift work and persist in calling me back to shift work without so much as checking with my doctor or having me checked out by a doctor to find out whether or not I am able to go back to work.

5

On December 8, 1989, Lueck filed a complaint in District Court alleging that UPS had discharged him because he had filed a workers' compensation claim, in violation of the retaliatory discharge provision in the Workers' Compensation Act, § 39-71-317(1), MCA, and that UPS had intentionally inflicted emotional distress by refusing to alter his work schedule in May 1988. In 1991 Lueck amended his complaint by adding a new cause of action under § 39-71-317(2), MCA, alleging that UPS had failed to give him preference for a position that became vacant within two years after the date of his injury, as the statute requires. The District Court granted summary judgment on the amended complaint on May 14, 1992, after oral argument on January 14, 1992.

The issue on appeal is whether the District Court erred in granting summary judgment and dismissing Lueck's retaliatory discharge, preference, and emotional distress claims. We will address each of Lueck's claims separately.

The Retaliatory Discharge Claim

Lueck contends that the District Court should not have dismissed his retaliatory discharge claim because the record contains sufficient facts from which a jury could infer that he was discharged for filing a workers' compensation claim. He relies on Lingle v. Norge Division of Magic Chef, Inc. (1988), 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410, for the proposition that employer motivation is a factual question and is not appropriate for summary judgment. In Lingle, however, the Supreme Court did not decide whether summary judgment was appropriate in a retaliatory discharge

6

action. Instead, it held that the appellant's retaliatory discharge remedy under the Illinois Workers' Compensation Act was not preempted by Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a). The relevant holding in Lingle follows:

> [I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is pre-empted and federal labor-law principles . . . must be employed to resolve the dispute.

Lingle, 486 U.S. at 405-406. In the case before us as well, a decision on the merits of Lueck's retaliatory discharge claim can be made without reference to the collective bargaining agreement. See Foster v. Albertsons, Inc. (Mont. 1992), 835 P.2d 720, 49 St.Rep. 638 (directed verdict based on § 301 preemption reversed, following Lingle, because appellant's wrongful discharge claim could be resolved without reference to the collective bargaining agreement).

Here, however, the District Court granted summary judgment in favor of UPS, not because Lueck's claims were preempted by § 301 but because Lueck had failed to exhaust the remedies available to him under the collective bargaining agreement between his union and UPS. To support its argument that summary judgment was properly granted for this reason, UPS relies on Brinkman v. State (1986), 224 Mont. 238, 729 P.2d 1301.

In Brinkman, we upheld the district court's grant of summary judgment for the respondents based on the state-employee appellant's failure to exhaust his contractual remedies under a

7

collective bargaining agreement. To the extent that Brinkman is based on federal preemption under § 301, our holding there was overruled in Foster, 835 P.2d at 725. But to the extent that Brinkman requires an employee subject to a collective bargaining agreement to exhaust his remedies under that agreement, it is not overruled. We hold, as we held in Brinkman, that union employees "must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress," for a "contrary rule which would permit an . . . employee to completely sidestep available grievance procedures in favor of a lawsuit has little to recommend it." 729 P.2d at 1305-1306. Accord, Fellows v. Sears, Roebuck & Co. (1990), 224 Mont. 7, 795 P.2d 484.

The collective bargaining agreement in effect between UPS and the Teamsters Union in 1988 provides in pertinent part that:

> The right to process and settle grievances is wholly, to the exclusion of any other means available, dependent upon the provisions of this Article.
>
> . . .
>
> The Union and the Employer agree that there shall be no strike, picketing, lockout, tie-up, or legal proceedings without first using all possible means of a settlement, as provided for in this Supplement . . . .

The agreement includes specific steps for a discharged employee to follow in settling the grievance over his discharge, and ultimately provides for binding arbitration.

Lueck attempted to meet with the Teamsters Union representative in Billings in September 1988, but the union representative broke their appointment. Concluding that relying on the union was "fruitless," Lueck did not attempt to contact the

8

union or enlist its support after he was discharged in December 1988. Clearly, he did not attempt to use the grievance procedure in the collective bargaining agreement before he resorted to legal action in 1989.

Even if Lueck had gone through the prescribed grievance procedure, however, his retaliatory discharge claim would fail for lack of evidence. To prove retaliatory discharge under § 39-71-317, MCA, Lueck would have to show (1) that he was discharged and (2) that UPS's motive in discharging him was to retaliate for his filing a claim under the Workers' Compensation Act. UPS amply documented its efforts to persuade Lueck to return to work, which were justified by the information it had at the time. From UPS's point of view, Lueck simply abandoned his job without providing a coherent explanation and without filing a grievance after he was discharged.

Summary judgment is appropriately granted where no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P. The party moving for summary judgment has the initial burden of demonstrating that "there is no genuine issue as to any fact deemed material in light of the substantive principles that entitle the movant to judgment as a matter of law." Fleming v. Fleming Farms, Inc. (1986), 221 Mont. 237, 241, 717 P.2d 1103, 1105-1106. Once the movant has met this burden, the party opposing the motion must show "by present facts of a substantial nature that a material fact issue does exist. Mere conclusory or speculative statements are

9

insufficient to raise a genuine issue of material fact." Mayer Bros. v. Daniel Richard Jewelers, Inc. (1986), 223 Mont. 397, 399, 726 P.2d 815, 817 (citations omitted); see also First Security Bank of Bozeman v. Jones (1990), 243 Mont. 301, 303, 794 P.2d 679, 681, and Kenyon v. Stillwater County (Mont. 1992), 835 P.2d 742, 744, 49 St.Rep. 673, 674.

Lueck has provided no facts to show or even suggest that UPS fired him in December for filing a workers' compensation claim in July. Lueck must provide facts that support a reasonable inference that UPS's motive was retaliatory, as mere assertions of a retaliatory motive are not enough to defeat a motion for summary judgment. See Kenyon, 835 P.2d at 745; Foster v. Arcata Associates, Inc. (9th Cir. 1985), 772 F.2d 1453, 1459.

Lueck implies that because UPS knew of Dr. Harkness' statement on Lueck's July 1988 credit disability claim form, it could have had no reason other than retaliation for firing him. He does not explain why UPS should have given that statement greater weight than Dr. Harkness' later statement on Lueck's October 1988 application for union benefits, which indicated that Lueck was able to work, or why UPS's failure to give the earlier statement greater weight is evidence that he was fired in retaliation for filing a workers' compensation claim.

We hold that the District Court concluded correctly that Lueck did not raise a genuine issue of material fact regarding UPS's motive for terminating his employment.

10

The Preference Claim

Section 39-71-317(2), MCA, provides that

When an injured worker is capable of returning to work within 2 years from the date of injury and has received a medical release to return to work, the worker must be given a preference over other applicants for a comparable position that becomes vacant if the position is consistent with the worker's physical condition and vocational abilities.

In his amended complaint, Lueck alleged that when a vacancy occurred in Glendive in March 1989, UPS was required by this statute to prefer him for it. UPS, however, did not notify Lueck that the position was available.

The District Court dismissed this claim on the grounds that (1) Lueck was not an injured worker under the definition in the Workers' Compensation Act, and (2) if he had been injured, he would have had to apply for the preference within two years after the injury. Lueck made no such application.

Under § 39-71-119, MCA, an "injury" consists of physical harm to the body and is caused by an accident, which is defined as an "unexpected traumatic incident or unusual strain" that is caused by a specific event on a single day or during a single work shift. It does not include a physical or mental condition arising from emotional or mental stress. The District Court correctly decided that this statutory definition does not include Lueck's "adverse stress reaction" of June 9, 1988.

Lueck argues that his condition actually was an "occupational disease," defined in § 39-72-102, MCA (1987), as "harm, damage or death as set forth in 39-71-119(1) arising out of or contracted in

11

the course and scope of employment and caused by events occurring on more than a single day or work shift." Although the statute goes on to exclude conditions arising from emotional or mental stress, Lueck argues that his condition was caused by "physical disruption of his eating and sleeping schedule" and therefore is not excluded. The District Court concluded correctly, however, that the term "injury" in the preference statute, § 39-71-317(2), MCA, does not include occupational disease.

Lueck contends that the District Court's reading of the preference statute is too narrow, and that it erred in ignoring the declaration of public policy in § 39-71-105(3), MCA (1987), which states that "an objective of the workers' compensation system is to return a worker to work as soon as possible after the worker has suffered a work-related injury or disease." UPS argues that this objective does not apply to an occupational disease, for there is no good reason to return a worker to a job that caused his disease. The District Court agreed, concluding correctly that the preference statute applies only to work-related injuries.

We review a district court's interpretation of the law only for correctness. Steer, Inc. v. Dep't of Revenue (1990), 245 Mont. 170, 803 P.2d 601. Here, we conclude that the District Court correctly interpreted the preference statute as excluding Lueck's condition, and that UPS therefore was entitled to summary judgment on Lueck's preference claim, as a matter of law.

The Emotional Distress Claim

Lueck claims that as a result of UPS's refusal to alter his

12

work schedule and as a result of his termination, he suffered severe emotional distress. His emotional distress was severe enough that he sought counselling and was on medication for several months.

This Court has adopted the requirements for recovering damages for infliction of emotional distress that are set out in Restatement (Second) of Torts § 46 comment j (1965). First Bank (N.A.)-Billings v. Clark (1989), 236 Mont. 195, 206, 771 P.2d 84, 91. The victim must show that the defendant's tortious conduct resulted either in physical or mental injury or in "a substantial invasion of a legally protected interest," and that it "caused a significant impact," including emotional distress "so severe that no reasonable person could be expected to endure it." Clark, 771 P.2d at 91. Accord, Doohan v. Bigfork School Dist. No. 38 (1991), 247 Mont. 125, 805 P.2d 1354.

The District Court concluded that UPS's actions did not approach the level of outrageousness needed to establish a prima facie case of intentional infliction of emotional distress. See Frigon v. Morrison-Maierle, Inc. (1988), 233 Mont. 113, 123, 760 P.2d 57, 64 (the defendant's conduct must be "so outrageous . . . as to go beyond all possible bounds of decency").

In the past we have characterized emotional distress as an element of damages rather than a distinct cause of action; see Frigon, 760 P.2d at 63; Shiplet v. First Security Bank (1988), 234 Mont. 166, 171, 762 P.2d 242, 247. Even if considered only for the purpose of establishing damages, however, Lueck's deposition

13

testimony demonstrates the absence of any genuine issue of material fact concerning the severity of his alleged emotional distress. UPS was entitled to summary judgment on this claim.

AFFIRMED.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

Justice William E. Hunt, Sr., dissenting.

I dissent.

_____
Justice

14

April 13, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Michael G. Eiselein
LYNAUGH, FITZGERALD, EISELEIN & EAKIN
P.O. Box 1729
Billings, MT  59103-1729

STEVEN LEHMAN
CHRIS MANGEN, JR.
Crowley, Haughey, Hanson, Toole & Dietrich
P.O. Box 2529
Billings, MT 59103-2529

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy