No. 99-100

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 34

298 Mont. 213

994 P. 2d 1124

KENNETH MALONEY and

DAWN MALONEY,

Plaintiffs and Respondents,

v.

HOME AND INVESTMENT CENTER, INC., d/b/a

CENTURY 21 HOME AND INVESTMENT CENTER, INC.,

SHARON COSTANTINO, and LARRY O. LEE,

Defendants and Appellants.

APPEAL FROM: District Court of the Eleventh Judicial District,

In and for the County of Flathead,

The Honorable Ted O. Lympus, Judge presiding.

COUNSEL OF RECORD

For Appellant:

Marshall Murray, Law Office of Marshall Murray, Kalispell, Montana

For Respondent:

Chas. D. Dearden, Columbia Falls, Montana

_____

Submitted on Briefs: April 29, 1999

Decided: February 8, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1.Appellants Larry O. Lee (Lee) and Home and Investment Center, Inc., d/b/a Century 21 Home and Investment Center, Inc. (Century 21), appeal from a May 16, 1996 Order issued by the Eleventh Judicial District Court, Flathead County, which imposed sanctions against Appellants for discovery violations; and, from the same District Court's November 25, 1998 Judgment awarding damages to Respondents Kenneth and Dawn Maloney (Maloneys).

¶2.We affirm in part and reverse in part.

¶3.Lee and Century 21 raise the following issues on appeal:

1. Did the District Court err in its May 16, 1996 Order as to the extent and severity of the sanctions imposed?

2. Did the District Court err in its November 25, 1998 Order, adopting the Special Master's original and amended findings of fact, conclusions of law and recommendation and judgment?

**Factual and Procedural Background**

¶4.This matter involves the determination of damages flowing from the tortious interference by Century 21 and Lee, as president of Century 21, (hereafter referred to

singularly as "Lee"),[1] with the Maloneys' right to purchase a 74.6 acre parcel adjacent to their property near Polebridge, Montana. Polebridge is located in a fairly remote area west of Glacier Park in northwest Montana.

¶5. The 74.6 acre parcel in question was owned by C. M. "Bud" Fishel (Fishel). The Maloneys, who reside in Fargo, North Dakota, have spent lengthy stays during the summers and winters in the Polebridge area since the early 1980s. Enamored of the area, they purchased a 20-acre parcel from Fishel in 1990. From that date forward, the Maloneys became well-acquainted with Fishel, and expressed an interest in the subject parcel, which is adjacent to their present 20-acre parcel. The Maloneys claim they dreamed of building their retirement home on the parcel, which provides access to Forest Service land and views of Glacier Park peaks in the distance.

¶6. Fishel, who is retired from a career in the timber industry, had cleared approximately two acres for a home site, and had drilled a well in anticipation of some day selling the parcel. Fishel acknowledges that the Maloneys did indeed frequently express interest in the property. At one point, Fishel sent them a letter stating "If I ever plan to sell, I'll let you know in advance." In fact, one of the first things Fishel did, once he decided to sell the property, was to discuss the matter with the Maloneys in January or February of 1991. Price terms were mentioned, but nothing definite was determined. In fact, Fishel would testify that he was left with the impression that the Maloneys, although interested, perhaps did not want to purchase the entire 74.6 acres. Nevertheless, it was his intention to ensure that they had the first opportunity to purchase the land when the time came.

¶7. That time arrived on May 3, 1991, when Fishel went to the office of Century 21 in Kalispell. There, he met with a Century 21 agent named Sharon Costantino (Costantino). Fishel specifically directed Costantino to first offer the property to the Maloneys and then another party, James M. Gaitis (Gaitis). Gaitis, another adjacent landowner, had likewise expressed an interest in the property that spring. When price terms were discussed, Fishel told Costantino he would not sell the property for less than $1,500 an acre. The land apparently had not been appraised and Fishel was actually seeking her guidance in determining a fair price. Fishel testified that Costantino immediately prepared a listing agreement with the $1,500-an-acre price. Not content with fixing the price terms at that point, Fishel left that day, a Friday, without reviewing or signing the listing agreement.

¶8. Approximately forty-five minutes later he received a call at home from Costantino. She informed him that she was in receipt of $1,000 in earnest money from an interested buyer,

who he would later learn was Stephen Krasemann (Krasemann).

¶9.On Monday morning, May 6, Costantino arrived at Fishel's residence with a listing agreement in hand. Fishel indicated to her that he was upset that she had proceeded with the $1,500-an-acre price without his approval or signing a listing agreement. Costantino persuaded Fishel to proceed with the sale, suggesting that if Krasemann for some reason backed out, she would seek a higher price from future potential buyers. She also gave him the impression that it was too late to do anything but proceed with the sale. She did not inform Fishel, at the time, that she had not contacted either the Maloneys or Gaitis. Reluctantly, Fishel agreed to sign both the listing agreement and a buy-sell agreement.

¶10.Fishel would later learn that Costantino had not, in fact, offered the land to the Maloneys or Gaitis. It was alleged that Krasemann and Costantino had earlier agreed that if she arranged for Krasemann's purchase of Fishel's property--a transaction which would provide her with a full commission--he would subsequently list another parcel with Costantino from which she could derive yet another commission. It is undisputed that in the event either the Maloneys or Gaitis decided to purchase the parcel, Costantino's, as well as Century 21's, commission would be halved, a condition that was drafted into the listing agreement by Costantino at Fishel's request.

¶11.Upon learning that Costantino never attempted to contact the Maloneys, Fishel attempted to halt the sale on several occasions, and later testified that he "didn't think the deal was right." He was dissuaded from this by both his attorney, as well as Lee. Whether in fact Krasemann threatened to initiate litigation remains in dispute.

¶12.Lee was president of the Kalispell Century 21, and at all times was Costantino's supervising broker. Thus, the Special Master would conclude that Lee was "responsible for Costantino's conduct." Lee met with Ken Maloney and Gaitis on June 27, 1991. He was advised during this meeting that Costantino had never contacted the Maloneys or offered them the subject property as directed by Fishel. The Maloneys claim that at this meeting Ken strongly asserted they had a written first-option to buy from Fishel, and that Costantino had deliberately supplanted these agreements by her dealings with Krasemann. Thereafter, Lee made no attempt to stop the pending sale of the subject property to Krasemann, and, allegedly, displayed a callous indifference to whether the Maloneys' claims were valid. The subject property sold for $111,900, or approximately $1,500 an acre, and closed on July 9, 1991. Fishel would later testify that although the sale price was a "steal" for Krasemann, the price was "the least of my worries . . . I wanted a fair price,

but primarily I wanted . . . this party [the Maloneys] to have a chance to be honored. It wasn't done." Costantino received a $6,182.40 commission. Century 21 received a $4,121.60 commission.

¶13.In reaching this appeal, this matter has traveled a long and winding procedural road from its remote origins. Gaitis's original complaint was filed July 9, 1991. A discovery imbroglio ensued, with Gaitis charging counsel for Costantino and Century 21 with dilatory tactics. He filed a motion to compel on November 6, 1991. He filed further motions to compel on February 12, 1992, and March 12, 1992. Finally, on August 19, 1992, the District Court partially granted Gaitis's second motion to compel.

¶14.The Maloneys joined as plaintiffs, consolidating their case with Gaitis on January 7, 1993. Lee was added as a party defendant. Both Gaitis and the Maloneys filed amended complaints. Gaitis filing for a writ of supervisory control, which was denied on July 23, 1993. Soon thereafter, Gaitis dismissed his case.

¶15.The pattern of discovery delays, motions to compel, orders to compel, and intimation of sanctions continued for several years. Specifically, the Maloneys filed a motion to compel on September 1, 1993. This motion was interrupted by summary judgment proceedings, which were resolved in favor of the Maloneys. The Maloneys served further discovery requests in May of 1994. The court ordered response from Century 21 and Lee on October 19, 1994.

¶16.Meanwhile, a $88,000 default was entered against Costantino in September of 1994 after she apparently fled the state, and her counsel was unable to contact her. This left the Maloneys as plaintiffs, and Century 21 and Lee as defendants.

¶17.The requested responses were still not provided, forcing the Maloneys to file another motion on June 14, 1995, against Lee for his failure to comply with the court's order. The court again ordered the production of the requested materials, this time imposing a deadline of August 24, 1995. Again, responses were not complete. On October 6, 1995, the Maloneys filed another motion seeking sanctions. The requested material, which had been ordered produced no later than August 24, 1995, was provided on October 19, 1995.

¶18.Subsequent to the foregoing, the Maloneys served additional follow-up discovery on Lee on November 13, 1995. Five months later, on April 26, 1996, the Maloneys filed another motion for sanctions for Lee's failure to respond to the November requests as well

as further requests served on February 16, 1996. The court again ordered production from Lee, and again the materials were not produced.

¶19.Finally, the District Court granted the Maloneys' third motion for sanctions on May 16, 1996. Pursuant to Rule 37(d), M.R.Civ.P., the District Court stated that:

Defendant Lee has exhibited a continuing practice of willfully ignoring the rules of discovery and discovery orders. He has caused, and is continuing to cause, delay in the proper progressing of the Plaintiffs' case. Such dilatory tactics cannot be countenanced. This Court previously has encouraged Defendant's cooperation in the discovery process to no avail. The imposition of sanctions of the dilatory abuse of discovery is to be regarded with favor.

¶20.Thus, the court ordered that the allegations in the Maloneys' complaint as to liability "are taken as established against Defendant Lee for the purposes of this action." Furthermore, the court determined that the "appropriateness of punitive damages is taken as established for purposes of this action." Therefore, the trial of this matter was reduced to "the issue of damages as asserted in Plaintiffs' complaint and the amount of punitive damages to be awarded against Defendant Lee."

¶21.A non-jury trial was held before a Special Master on February 3, 1997. The Special Master issued its Findings of Fact, Conclusions of Law, and Recommendation on September 30, 1997, and an amended Findings of Fact, Conclusions of Law, and Recommendation on October 3, 1997, which corrected a mathematical error in the damage calculations. Shortly thereafter, counsel for Lee and Century 21 withdrew, on October 21, 1997, and Lee's current counsel was substituted.

¶22.The Special Master found that "[b]ecause of the actions of the Defendants the Maloneys were deprived of their opportunity to purchase the subject property at that price." The Special Master then found, based on the expert testimony of a licensed real estate appraiser, that the property was worth $280,000, as of November 1996. Thus, the Maloneys "suffered an economic loss as a result of their inability to purchase the Fishel property in the amount of the difference, $168,100." The Special Master also found that a neighbor of the Maloneys had offered to sell them a similar, adjoining 80-acre parcel for $400,000. Based on the price of this "replacement" parcel, the Special Master determined that the Maloneys would require $288,100 in damages "to put them back into a position roughly equivalent to the position they held before the Defendants' conduct."

¶23.The Special Master also determined that the Maloneys had suffered "shock, worry, anger, disappointment, and frustration" and would continue to experience such distress in the future. The Maloneys testified that after receiving the option to buy commitment from Fishel, they thereafter did not build on their own property, awaiting the day that Fishel would sell. The sale to Krasemann left them "devastated." They claimed they then had endured the experience of watching Krasemann, from the vantage point of their adjacent parcel, build a 3,000 square-foot home on what should rightfully have been their property, and then attempt to sell it for $637,000. Unlike Fishel, Krasemann refused the Maloneys access to the adjacent Forest Service land. The Special Master concluded that $100,000 represented a reasonable compensation for the emotional distress suffered by the Maloneys "during the last five and one-half years and which they can reasonably be expected to endure into the future."

¶24.Finally, the Special Master determined that "[d]espite Lee's knowledge of certain harm to the Maloneys," he nevertheless acted intentionally and indifferently, with a "complete disregard for the harm . . . so that he could receive a higher commission." Furthermore, "Lee has clearly demonstrated a willingness to violate the law for personal gain . . . [b]y his intentional inaction Lee doubled his fee." Therefore, the Special Master recommended an award of $75,149.00 for punitive damages.

¶25.The District Court, finding and concluding that the Special Master's Findings of Fact, Conclusions of Law, and Recommendation were not clearly erroneous, adopted the same by order on November 25, 1998. The court entered judgment in favor of the Maloneys for a total sum of $464,249.00. Based on the Special Master's recommendations, the court awarded $288,000.00 in compensation for economic loss damages, $100,000.00 in compensatory damages for emotional distress, and $76,149.00 in punitive damages.

¶26.Lee and Century 21 appeal the Rule 37 discovery sanctions and the damages awarded to the Maloneys by the District Court's judgment.

## Standard of Review

¶27.Our standard of review of sanctions imposed under Rule 37, M.R.Civ.P., is whether the district court abused its discretion. *Carl Weissman & Sons, Inc. v. D & L Thomas Corp.*, 1998 MT 213, ¶ 53, 290 Mont. 433, ¶ 53, 963 P.2d 1263, ¶ 53 (citation omitted).

¶28.Rule 53, M.R.Civ.P., allows a district court to appoint a master in complicated cases

to examine the matter and make a report thereupon. Rule 53(e)(2), M.R.Civ.P., is clear that, in non-jury actions such as this, "the [trial] court shall accept the master's findings of fact unless clearly erroneous." The burden of challenging the master's findings is on the party objecting; the related burden of establishing that a finding is clearly erroneous also is on the party objecting. *Marriage of Doolittle* (1994), 265 Mont. 168, 171-72, 875 P.2d 331, 334.

Thus, we apply the same standard of review to an adopted master's report that we do to any other district court order. *Schmidt v. Colonial Terrace Associates* (1985), 215 Mont. 62, 66, 694 P.2d 1340, 1343.

¶29.This Court reviews the findings of a court to determine if the court's findings are clearly erroneous. Rule 52(a), M.R.Civ.P. We review a district court's conclusions of law to determine whether those conclusions are correct. *Hollister v. Forsythe* (1995), 270 Mont. 91, 93, 889 P.2d 1205, 1206. Further, this Court will not disturb an award of damages unless the amount awarded is so grossly out of proportion to the injury as to shock the conscience. *Hansen v. Hansen* (1992), 254 Mont. 152, 159, 835 P.2d 748, 752.

## DISCUSSION

### *Issue 1.*

*Did the District Court err in its May 16, 1996 Order as to the extent and severity of the sanctions imposed?*

¶30.Lee admits that discovery sanctions are warranted for his abuses of the discovery process, but contends that the District Court's order was simply too severe. Specifically, he contends that his counsel, which withdrew from representation in 1997, should alone suffer the punishment.

¶31.Under Rule 37, M.R.Civ.P., a party's dilatory tactics in responding to discovery requests may result in sanctions. The court in which the action is pending on motion "may make such orders in regard to the failure as are just, and among others it may take any action authorized under paragraphs (A), (B), and (C) of subdivision (b)(2) of this rule." Rule 37(d), M.R.Civ.P.

¶32.Under Rule 37(b)(2), M.R.Civ.P., a failure to comply with an order may result in: (A)

An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order; (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence; and (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

¶33.Thus, the District Court, due to Lee's "dilatory tactics" coupled with the fact that the court had issued numerous orders seeking his "cooperation in the discovery process to no avail" ordered that Lee was liable, that the appropriateness of punitive damages was taken as established, and that trial would be limited to the issue of damages. Lee contends that such severity--which amounted to a default judgment--was an abuse of discretion. We disagree.

¶34.This Court's position is that dilatory abuse of discovery must no longer be dealt with leniently and that the transgressors of discovery abuses should be punished rather than encouraged repeatedly to cooperate. *See Smith v. Butte-Silver Bow County* (1996), 276 Mont. 329, 332, 916 P.2d 91, 92-93 (reversing district court's dismissal with prejudice of non-compliant party's case). "When litigants use willful delay, evasive response, and disregard of court discretion as part and parcel of their trial strategy, they must suffer the consequences." *Owen v. F.A. Buttrey Co.* (1981), 192 Mont. 274, 280, 627 P.2d 1233, 1236. Further, "we generally defer to the decision of the district court regarding the appropriate sanction for discovery abuses." *Smith*, 276 Mont. at 336, 916 P.2d at 95.

¶35.Subject to the foregoing policy, we have identified certain criteria in reviewing whether a sanction is an abuse of discretion, or, as Lee contends, is too severe. We look to 1) whether the consequences imposed by the sanctions relate to the extent and nature of the actual discovery abuse; 2) the extent of the prejudice to the opposing party which resulted from the discovery abuse; and 3) whether the court expressly warned the abusing party of the consequences. *See Smith*, 276 Mont. at 339-40, 916 P.2d at 97.

¶36.Here, we conclude that Lee's intransigent approach to resolving this dispute satisfactorily fulfills all three of the above criteria and therefore no abuse of discretion occurred. The court here determined that liability as well as the appropriateness of punitive damages was established. This sanction still permitted Lee to contest damages at

trial and, conceivably, prevail in persuading the court with sufficient evidence that little or no damages were actually warranted. *See Dawson v. Billings Gazette* (1986), 223 Mont. 415, 419-20, 726 P.2d 826, 829 (affirming jury verdict of zero damages against party found liable for its breach of good faith and fair dealing duty). Thus, he did not suffer "the ultimate sanction." Rather, Lee personally showed little interest in adjudication on the merits for three years, and thus the District Court was forced to move from issuing orders to comply to imposing sanctions. We therefore conclude that consequences of the sanctions correlate with the nature of the discovery abuse. Likewise, the Maloneys, who immediately encountered prejudice in litigating this matter due to Lee's recalcitrance, should not have been expected to continue under a cloud of uncertainty due to potential further discovery delays by May of 1996. Finally, the court, in denying earlier motions for sanctions nevertheless warned Lee, as well as Century 21, that such consequences would be forthcoming should further uncooperative tactics continue. The court, in fact, displayed considerable patience and forbearance in reviewing the numerous motions to compel and requests for sanctions.

¶37.Further, we hold that Lee's contention that his counsel should shoulder the blame is without merit. *See Landauer v. Kehrwald* (1987), 225 Mont. 322, 325, 732 P.2d 839, 841 (concluding that although party may have been unaware of one discovery request, an attorney's "attitude of unresponsiveness to the judicial process warrants the imposition of sanctions, including dismissal"). *See also Kendall/Hunt Pub. Co. v. Rowe* (Iowa 1988), 424 N.W.2d 235, 241 (stating "well-established rule" that clients are responsible for the willful actions of their lawyers and in appropriate circumstances dismissal or default may be visited upon them because of the actions of their lawyers).

¶38.We conclude that Lee was well aware of the discovery process in this matter long before the court decided, in May of 1996, to issue sanctions, given the duration of the discovery and the partial and incomplete responses provided first by Century 21 and then by Lee himself. In light of continuous pattern of non-compliance in this matter, which resulted in the court issuing orders on three separate occasions prior to its final order determining liability, we hold there was no abuse of discretion by the District Court in ordering sanctions against Lee.

### *Issue 2.*

*Did the District Court err in its November 25, 1998 Order, adopting the Special Master's original and amended findings of fact, conclusions of law and recommendation and*

*judgment?*

¶39.Lee contends that the Special Master's findings and conclusions, which the District Court adopted, contain several key erroneous findings and improper conclusions. He claims that the theory under which the Maloneys prevailed does not exist in Montana; even if it does, damages were improperly calculated; the Maloneys' claim for emotional distress does not meet the necessary standard for severity; and, finally, that the award of punitive damages was an abuse of discretion.

## A. Intentional Interference with Prospective Economic Advantage

¶40.Lee argues that the tort of "interference with prospective economic advantage" does not exist under Montana law. Due to his deemed liability under the court's discovery sanctions, Lee argues that he was not afforded the opportunity to disprove this "unfounded tort theory," and consequently an abuse of discretion occurred.

¶41.In *Morrow v. FBS Ins. Montana-Hoiness Labar, Inc.* (1988), 230 Mont. 262, 749 P.2d 1073, however, we agreed with a district court's identification of the elements for the tort of "intentional interference with prospective economic advantage," which are identical to those we have identified as the tortious or intentional interference with contractual relations. *Morrow*, 230 Mont. at 266-67, 749 P.2d at 1076. We have set forth the elements as acts that:

(1) are intentional and willful;

(2) are calculated to cause damage to the plaintiff's business;

(3) are done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor; and

(4) result in actual damages or loss.

*See Sebena v. American Auto. Ass'n (1996), 280 Mont. 305, 309, 930 P.2d 51, 53 (identifying elements of "intentional interference with prospective economic advantage"); Bolz v. Myers (1982), 200 Mont. 286, 295, 651 P.2d 606, 611 (identifying prima facie case for interference with contractual or business relations).*

¶42.The key difference between the two tort theories is that unlike interference with

contractual relations, intentional interference with either "business relations" or "prospective economic advantage" does not require that a contract exist between any of the involved parties. Rather, the focus of the legal inquiry is on the intentional acts of the "malicious interloper" in disrupting a business relationship. *See*, *e.g.*, *Buckaloo v. Johnson* (Cal. 1975), 537 P.2d 865, 869. Under this theory, "a person who is involved in an economic relationship with another, or who is pursuing reasonable and legitimate prospects of entering such a relationship, is protected from a third person's wrongful conduct which is intended to disrupt the relationship." *Ellis v. City of Valdez* (Alaska 1984), 686 P.2d 700, 707. Thus, it is useful to observe the language employed by other courts, that the plaintiff's "business" includes "reasonable expectation of entering into a valid business relationship." *See, e.g., Cook v. Winfrey* (7th Cir. 1998), 141 F.3d 322, 327.

¶43.Although not artfully pled by the Maloneys or precisely analyzed by the court, we conclude that the above elements were sufficiently addressed in the Special Master's recommendations as adopted by the District Court--mindful of the fact that liability under this theory was established pursuant to the discovery sanctions. The evidence clearly shows that Lee knew of the existing or potential business relationship between Fishel and the Maloneys prior to the closing date; he was made fully aware that Fishel had expressly requested that Century 21 offer the property to the Maloneys before seeking other buyers; and he--acting as president of Century 21 and duty bound by his own profession's stringent code of ethics--nevertheless intentionally proceeded with actions that would foreseeably damage the Maloneys. The Special Master found that "[b]ecause of the actions of the Defendants the Maloneys were deprived of their opportunity to purchase the subject property at that price [$111,900]." The Special Master also found that Lee was fully aware that had the property been offered and then sold to the Maloneys, his commission "would have been reduced by one-half." Thus, there was no right or justifiable cause on the part of Lee beyond his own pecuniary gain.

¶44.We conclude, therefore, that Lee's argument that he was prevented from challenging this "unfounded" tort theory is entirely without merit.

## B. Economic Damages

¶45.Lee next argues that even if he is liable for the economic damages attributed to his intentional interference with the Maloneys' prospective economic advantage, the damages were improperly calculated. We agree with Lee, but only to a limited extent.

¶46.Specifically, Lee contends that the date of determining such economic damages should have been based on the July 9, 1991 Fishel-Krasemann sale price of $111,900, the date when the alleged wrong occurred. He supports this argument by directing our attention to Montana's eminent domain statutes, which assess fair market value damages on the date of the "taking." *See* § 70-30-302(1), MCA. *But see* § 70-30-302(2), MCA (providing for 10 percent annual interest recovery on fair market value of property during course of eminent domain proceedings).

¶47.Lee's argument boils down to what amounts to nothing more than an expression of frustration with the steady appreciation of land prices in a remote area of Montana, which is somewhat ironic given the fact that his chosen profession applauds such events under more favorable circumstances. Further, the amount awarded by the District Court, $288,100, is actually *less* than what would have been assessed under his eminent domain theory, due to the fact that the $111,900 sale price was likely below fair market value at the time, and damages for "takings" accrue 10 percent annual interest from the time of service--July of 1991 in this case--until the matter is finally resolved, including appeal. Finally, the 74.6 acres at issue here continued to appreciate while Lee continued to frustrate the discovery process--obviously, through no fault of the Maloneys.

¶48.Contrary to Lee's own unfounded theory, the fundamental purpose of any tort remedy is to return the plaintiff to his or her rightful position, or the position or state the party *would have attained* had the wrong not occurred. *See Butler v. Germann* (1991), 251 Mont. 107, 110, 822 P.2d 1067, 1069. We conclude that this is precisely the underlying principle of the Special Master's damage assessment.

¶49.First, the Special Master properly determined the economic damage pursuant to § 27-1-317, MCA. Under § 27-1-317, a breach of obligation other than contract requires that "the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

¶50.The substantial evidence followed by the Special Master indicates that by 1994, the 74.6 acre parcel had appreciated to $200,000. By November of 1996, the estimated market value of the property had risen to $280,000, resulting in an prospective economic loss to the Maloneys of $168,100. Further, the Special Master found that with the addition of a two-story, 3,000 square-foot home, the property was on the market in 1997 for a listed price of $637,000. The Special Master then proceeded to speculate that the bare land value

had escalated to $337,000. The Special Master also found that a similarly situated parcel of 80 acres had been offered to the Maloneys for $5,000 per acre, or $400,000. It was from this latter figure that the court speculated that the damages of $288,100 were appropriate, by subtracting the original Fishel-Krasemann sales price from the $400,000 asking price of this parcel.

¶51. Thus, the Special Master determined that:

The Maloneys cannot be put back into the position they held prior to the actions surrounding the sale since the desired property now has a dwelling on it and is listed at a higher price than they can afford. However, the 80-acre parcel which has been offered to them would provide them with many of the benefits of the subject property including direct access to the federal land. It is available for $400,000, but in order for the Maloneys to replace the subject property with the offered parcel, they would have to incur an additional cost of $288,100 ($400,000 - $111,900). That is the "cost" to put them back into a position roughly equivalent to the position they held before Defendants' conduct.

¶52. We conclude that the Special Master initially, as a matter of law, correctly estimated the Maloneys' damages when it subtracted Krasemann's purchase price of $111,900 from the November 1996 appraised value of $280,000, which was established by expert testimony at trial. Thus, the correct estimation of economic damages was $168,100, a figure arrived at but not ultimately recommended by the Special Master.

¶53. We must conclude, therefore, that it was incorrect for the Special Master to then speculate as to what an appropriate replacement parcel would cost as a means of ascertaining damages. Damages for the intentional interference with prospective business advantage must be proven by "substantial evidence which is not the product of mere guess or speculation." *Sebena*, 280 Mont. at 309, 930 P.2d at 53. Here, the adjoining neighbor's 80 acres, offered to the Maloneys, has nothing all to do with 74.6 acres that the Maloneys contend they rightfully should have been allowed to purchase, and from which a prospective economic advantage was lost.

¶54. We therefore conclude that the District Court's judgment for "economic loss in the sum of $288,100.00" should be modified in accordance with the Special Master's findings, based on the substantial evidence that the Maloneys' damage resulting from the intentional interference with the 74.6 acres in question was $168,100.

## C. Negligent or Intentional Infliction of Emotional Distress

¶55.Lee does not specifically argue that the $100,000 awarded to the Maloneys for emotional distress damages was excessive, or should "shock" this Court's conscience. *See generally Anderson v. Werner Enterprises, Inc.*, 1998 MT 333, ¶ 40, 292 Mont. 284, ¶ 40, 972 P.2d 806, ¶ 40 (stating that generally a jury award of damages will not be overturned unless it shocks the conscience of the Court). Rather, Lee argues that the findings and conclusions of the Special Master addressing the Maloneys' emotional distress do not "rise to the standard adopted by the Montana Supreme Court," suggesting that the award was not appropriate as a matter of law in this matter.

¶56.In support of this contention, Lee first cites to our decisions in *First Bank (N.A.)-Billings v. Clark* (1989), 236 Mont. 195, 771 P.2d 84; *Lueck v. United Parcel Service* (1993), 258 Mont. 2, 851 P.2d 1041; and *Days v. Montana Power Co.* (1990), 242 Mont. 195, 789 P.2d 1224. In his reply brief, Lee additionally cites to *Johnson v. Supersave Markets, Inc.* (1984), 211 Mont. 465, 686 P.2d 209, and *Sacco v. High Country Independent Press* (1995), 271 Mont. 209, 896 P.2d 411, in support of his contention that the emotional distress damages suffered by the Maloneys "do not rise to the standard set forth in either *Sacco* or *Johnson*."

¶57.Again, we must point out that liability for *all* compensatory damages was established by the discovery sanctions in this case, which we have affirmed. Thus, whether the elements for emotional distress were proven by substantial evidence is irrelevant to our inquiry. Nevertheless, emotional distress damages, as a matter of law, are not appropriate in all cases. *See, e.g., Kneeland v. Luzenac America, Inc.*, 1998 MT 136, ¶ 26, 289 Mont. 201, ¶ 26, 961 P.2d 725, ¶ 26 (stating that pursuant to § 39-2-905(3), MCA, emotional distress damages are precluded under the Wrongful Discharge From Employment Act). Given the fact that the Special Master repeats some of the same errors as the parties in addressing the current law on emotional distress, we are compelled to offer further guidance. Therefore, the following discussion is necessary in determining whether the District Court abused its discretion in adopting the findings and conclusions of the Special Master.

¶58.In *Sacco*, which involved claims for civil rights violations, malicious prosecution, and defamation, we established the non-derivative, independent causes of action for both negligent and intentional infliction of emotional distress. We stated that "[a]n independent cause of action for infliction of emotional distress will arise under circumstances where a

serious or severe emotional distress to the plaintiff was the reasonably foreseeable consequence of the defendant's negligent or intentional act or omission." *Sacco*, 271 Mont. at 238, 896 P.2d at 429.

¶59.All other authority cited by Lee, however, predates *Sacco* other than *Sacco* itself and must therefore be distinguished. For example, in *Lueck* we addressed the element of "outrageousness" once required by the tort of intentional infliction of emotional distress in Montana. This element, however, was eliminated by our holding in *Sacco*. Likewise, in *Day* we declined to extend recovery for emotional distress damages where the defendant negligently damaged or destroyed real property and the plaintiff suffered no physical injury, concluding that the mere negligence involved did not "substantially invade a legally protected interest." *Day*, 242 Mont. at 199-200, 789 P.2d at 1227. This case was reasoned pursuant to pre-*Sacco* derivative or "parasitic" tort analysis, which is no longer the law in Montana. *See Johnson*, 211 Mont. at 473, 686 P.2d at 213 (stating that in determining whether the distress is compensable absent a showing of physical or mental injury, "we will look to whether tortious conduct results in *a substantial invasion of a legally protected interest* and causes a significant impact upon the person of plaintiff") (emphasis added). The Special Master erred in addressing this element as well, concluding that Lee's conduct invaded a "legally protected interest."

¶60.In contrast to the foregoing, *First Bank* is still relevant because it addresses the "serious" or "severe" element articulated under *Sacco*, which is synonymous with the "significant impact" element found in *Johnson*. In *First Bank* we held that where a party only alleged that he "felt bad, lost sleep, and became withdrawn" as a result of a bank's derogation of its obligation to release him as a guarantor, such evidence was insufficient to warrant an emotional distress instruction. *First Bank*, 236 Mont at 207, 771 P.2d at 91-92 (stating that severe emotional distress is only a new interpretation of the existing "significant impact" requirement).

¶61.Therefore, notwithstanding Lee's legally flawed argument that either physical injury or a substantial invasion of a legally protected interest is necessary to recover damages for emotional distress, we are obliged to address the substance of Lee's claim that the Special Master's findings and conclusions do not, as a matter of law, support an award for damages under the element of "serious or severe," in light of the circumstances presented in this matter. Even with liability established, the amount of damages must be reasonable. *Topco, Inc. v. State, Dept. of Highways* (1996), 275 Mont. 352, 361, 912 P.2d 805, 810. Thus, if the evidence of the "serious or severe" emotional distress suffered by the

Maloneys is clearly erroneous, the $100,000 award as a matter of law would be excessive. Accordingly, we narrow our scrutiny to this element alone.

¶62.In *Sacco*, we adopted the standard for determining "serious or severe" as set forth by the Restatement (Second) Tort, which provides in pertinent part:

[Emotional distress] includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved . . . .

*Sacco, 271 Mont. at 234, 896 P.2d at 426 (quoting Restatement (Second) of Torts, § 46, comment j).*

¶63.Measuring this element requires a careful consideration of the circumstances under which the infliction occurs, and the party relationships involved, in order to determine when and where a reasonable person should or should not have to endure certain kinds of emotional distress.

¶64.Thus, the very same descriptive terms that have been used to characterize compensable emotional distress in some circumstances have also described emotional distress that has been denied recovery. *Compare Zugg v. Ramage* (1989), 239 Mont. 292, 298, 779 P.2d 913, 917 (affirming emotional distress damages for "chest pains," worries over financial stability, and "sleepless nights" resulting from tortious misrepresentation in sale of resort) and *Niles v. Big Sky Eyewear* (1989), 236 Mont. 455, 465, 771 P.2d 114, 119-20 (concluding that such evidence as a personality change and marital problems was sufficient to raise jury issue on negligent infliction of emotional distress) *with Lence v. Hagadone Inv. Co.* (1993), 258 Mont. 433, 444-45, 853 P.2d 1230, 1237 (concluding that evidence of one visit to a hospital emergency room "for stress and heart-related problems and circulatory problems" insufficient for recovery) and *McGregor v. Mommer* (1986), 220 Mont. 98, 111-12, 714 P.2d 536, 545 (concluding that financial problems resulting from tortious conduct, which "bothered" plaintiff "a lot" and "at times, it would show up at home," were not sufficiently serious to warrant jury instruction for emotional distress damages). *See also First Bank*, 236 Mont. at 206, 771 P.2d at 91 (disapproving of

recovery for loss of sleep and nervous tension).

¶65.Relevant to our discussion here, for example, two co-commentators have stated that the "proscription against recovery for emotional injury when the underlying harm is economic is nearly universal." *See* Leslie Benton Sandor & Carol Berry, *Recovery for Negligent Infliction of Emotional Distress Attendant to Economic Loss: A Reassessment*, 37 Ariz. L. Rev. 1247, 1268 (1995). Thus, by statute emotional distress damages, regardless of severity, cannot be recovered in a breach of contract action. *See Contreraz v. Michelotti-Sawyers* (1995), 271 Mont. 300, 309, 896 P.2d 1118, 1123 (relying on § 27-1-310, MCA, which prohibits damages for emotional or mental distress in contract actions unless plaintiff suffers physical injury); *but see Lee v. Kane* (1995), 270 Mont. 505, 893 P.2d 854 (affirming award for intentional infliction of emotional distress in breach of contract action where altercation between lessor and lessee resulted in physical injury).

¶66.Although this Court has never directly held so, emotional distress damages resulting from purely economic loss in non-contractual matters are rarely compensated as well. The implication stems, as Sandor and Berry suggest, from the notion that in the world of business transactions most all emotional distress is of the "transient and trivial" variety. Thus, in *McGregor*, the buyer of a wholesale and retail gasoline business could not show that the financial difficulty caused by the seller's fraudulent conduct sufficiently impacted him. The same holds true for Clark, the party in *First Bank*, who was the president and majority shareholder of a farm equipment wholesale business. *Zugg* is an exception to the foregoing economic damage rule. There, we concluded that "[a]lthough the amount of evidence of emotional distress is *close to the line* in this case . . . this testimony was sufficient to support submission of the issue of emotional distress to the jury." *Zugg*, 239 Mont. at 298, 779 P.2d at 917 (emphasis added). *See also Dunfee v. Baskin-Robbins, Inc.* (1986), 221 Mont. 447, 457, 720 P.2d 1148, 1154 (affirming award of $150,000 for emotional distress in franchise relocation dispute involving fraud and breach of good faith and fair dealing). As the Restatement comments suggest, "[t]here is no occasion for the law to intervene in every case where some one's feelings are hurt." Restatement (Second) of Torts, § 46 comment d.

¶67.Even so, where negligent damage to a property interest results in purely economic damage, Sandor and Berry argue that emotional distress damages should nevertheless be available:

Especially in the context of property damage, the damage itself provides the

trustworthiness of the plaintiff's claim for emotional distress, just as physical injury can provide the trustworthiness of a claim for pain and suffering.

Sandor & Berry, at 1273 (further stating that tortious intentional acts may precipitate recovery for emotional distress where only economic damages occur). As an Oregon court stated, "[i]t is difficult to imagine a circumstance in which damage to any property does not directly, naturally and predictably result in some emotional upset." *Meyer v. 4-D Insulation Co.* (Or. 1982), 652 P.2d 852, 854 (further stating that "it is the kind of interest invaded that, as a policy matter, is believed to be of sufficient importance to merit protection from emotional impact, that is critical"). *See generally*, Margaret Jane Radin, *Property and Personhood*, 34 Stan. L. Rev. 957, 1002-08 (1982) (suggesting that compensation based upon economic expectation and fair market value standards fails to include a person's subjective valuation of his or her "personal-identity" property; therefore, fair market value will often be insufficient to make a person whole in the context of eminent domain proceedings).

¶68. Aside from cases involving a strictly pecuniary interest in real estate, it is well settled in our case law, in point of fact, that emotional distress damages may result from negligent or intentional damage to property arising from interference with the use and enjoyment of land. *See French v. Ralph E. Moore, Inc.* (1983), 203 Mont. 327, 661 P.2d 844 (affirming award of $190,000 total damages to plaintiffs for "pain, discomfort, fears, anxiety, annoyance, inconvenience and other mental, physical and emotional distress suffered by plaintiffs as a result of the invading gasoline vapors" produced by negligent contamination of plaintiff's business and home). Similarly, in *Johnson v. Murray* (1982), 201 Mont. 495, 656 P.2d 170, although emotional distress was not specifically identified, we nevertheless affirmed an award of $100,000 in compensatory damages that included compensation for the "humiliation, embarrassment, distress, and ridicule" associated with the wrongful imposition of a lien on the plaintiff's real property that reduced its market value and "interfered with their use of their private property." *Johnson*, 201 Mont. at 507-508, 656 P.2d at 176-77. *See also Town of Stonington v. Galilean Gospel* (Me. 1999), 722 A.2d 1269. 1272 (holding that evidence of headaches and depression by property owners proved that noise from quarry operations caused them serious emotional distress); *Edwards v. Talent Irrigation Dist.* (Or. 1977), 570 P.2d 1169, 1170 (holding that "mental anguish" damages were recoverable following irrigation district's flooding of respondent's land); *Daluiso v. Boone* (Cal. 1969), 455 P.2d 811 (holding that removing of boundary fence over protests of elderly plaintiff resulted in infliction of mental distress).

¶69.We conclude that the property interest here sufficiently involves the use and enjoyment of land to fall within the foregoing category of holdings. Here, the Maloneys testified they were "devastated" by the sudden impact of Fishel's possible sale to someone else. They suffered intense emotional hardship during the ensuing weeks when they attempted to undue, unsuccessfully, the impending sale. Additionally, their testimony as to emotional distress was not substantially contested by Lee at trial. *See Rocky Mountain Enterprises, Inc. v. Pierce Flooring* (1997), 286 Mont. 282, 298, 951 P.2d 1326, 1336 (concluding evidence of party's domestic disputes was relevant because it showed that the claimed emotional distress may have been caused by other factors, and affirming denial of damages).

¶70.The Special Master concluded that the Maloneys had "suffered" and were entitled to compensation for the "shock, worry, anger, disappointment, and frustration they have suffered and *will experience in the future*." (Emphasis added). This conclusion, in part, is based on the fact that the Maloneys own property adjacent to the 74.6 acres where they have painfully watched Krasemann build a 3,000 square-foot home on the precise location where they envisioned their own retirement home would rest one day, and then proceed to place the property on the market for almost six-times what they may have paid for the property themselves had the tortious conduct not occurred.

¶71.The Special Master concluded, essentially, that no reasonable person should have to endure such emotional distress, especially in light of the inherent duration of their adjacent land ownership. We agree. The Maloneys, after all, were not developers in search of investment property to buy, improve, and then sell for purely economic gain; rather, they had formed a subjective relationship with the property on a "personal-identity" level. That compensable emotional distress would arise from the tortious interference with the Maloneys' rights to the property in question should have been clearly foreseeable by any person professionally involved with such transactions. We have determined that "[e]ach case must, of necessity, depend on its own peculiar facts." *French*, 203 Mont. at 336, 661 P.2d at 849. We have further ruled that the amount of damages is not the amount which in our opinion would compensate the injured party; rather, "it is a question of what amount of damages will the record in the case support when viewed, as it must be, in the light most favorable to the plaintiff." *French*, 203 Mont. at 336, 661 P.2d at 849 (citation omitted).

¶72.We hold, therefore, that the District Court did not err in adopting the Special Master's findings and conclusions that awarded damages to the Maloneys for emotional distress

under these fact-specific circumstances.

## D. Punitive Damages

¶73.Once again, Lee admits that "if the tort theory [is] sound . . . punitive damages might be proper." We agree with Lee. Again, we are limited by the discovery sanctions which established "the appropriateness of punitive damages." As for the actual award of punitive damages itself, Lee contends that the Special Master erred in determining his net worth and basing its conclusions on other unfounded findings of fact.

¶74.A defendant's net worth is only one of the factors to be considered in reviewing an award of punitive damages. *See* § 27-1-221(7)(b), MCA (listing nine considerations). Lee testified that his net worth was approximately $761,490, based on evidence of his past tax returns. He now claims that this amount represents economic interests held in joint tenancy with his wife--inferring that the award should be reduced by one-half. The Special Master considered this evidence along with the other relevant matters under the statute in arriving at its recommended punitive damage award of $76,149, "for the purpose of example to other persons in the realty business, and to punish the Defendant." The Special Master indicated that "Lee's financial condition and financial affairs are good." In following the clear directives of § 27-1-221(7)(b), we conclude that the Special Master did not arrive at a sum that was excessive. Therefore, based on Lee's financial net worth, we will not disturb the award of punitive damages as adopted by the District Court.

¶75.Further, the Maloneys agree that the Special Master's findings include an error. Under finding six, for example, the Special Master states that Costantino "prepared a listing agreement in which Fishel specifically directed Costantino to offer the property first to the Maloneys." The evidence shows that although Fishel directed Costantino to offer the property to the Maloneys, this condition was never actually memorialized in the listing agreement. The Special Master's error, however, is one of syntax and semantics, and does not countenance a reversal of damages. The overall evidence clearly and convincingly supports the Special Master's findings and conclusions that Lee refused to interfere with the Fishel-Krasemann sale knowing that the Maloneys would be damaged, all for the sake of personal gain. The same holds true for Lee's other contentions of error in the Special Master's findings.

¶76.Finally, Lee contends that the Special Master's improperly recognized punitive damages assessed against him in a prior case. *See Lauman v. Lee* (1981), 192 Mont. 84,

626 P.2d 830. He contends that pursuant to § 27-1-221(7)(b)(vii), MCA, the court may only consider "previous awards of punitive or exemplary damages against the defendant based upon the *same wrongful act*." We agree that the two cases involve different wrongful acts. However, the Special Master could also consider "any other circumstances that may operate to increase or reduce, without wholly defeating, punitive damages," pursuant to § 27-1-221(7)(b)(ix), MCA, and could have just as easily considered the previous award under this provision. Because the Special Master's consideration of the prior case was not improper as a matter of law, we will not disturb the District Court's adoption of the Special Master's recommendation regarding punitive damages.

¶77.In sum, in light of all evidence presented, including the extent and manner in which the Maloneys were damaged, we do not find the award of punitive damages inappropriate and thus affirm the District Court's adoption of the Special Master's recommendation.

¶78.Based on the foregoing, the District Court's judgment is affirmed in part and reversed in part and this case is remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART

1. Respondents assert in their brief that "for all practical purpose, the only Defendant remaining in this action is Lee." Appellants assert in their reply brief that "Respondents admit that Home is no longer a necessary or proper party, the only remaining party of concern being Lee."