No. 01-019

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 254N

RONALD McGINNIS,

        Plaintiff and Appellant,

   v.

CITY OF EAST HELENA, MONTANA,
a municipal corporation, and LARRY MOORE,

        Defendants and Respondents.

APPEAL FROM:    District Court of the First Judicial District,
                     In and for the County of Lewis and Clark,
                     The Honorable Thomas Honzel, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                John C. Doubek, Small, Hatch, Doubek & Pyfer, Helena, Montana

        For Respondent:

                Richard Larson, Chronister, Moreen & Larson, Helena, Montana

Submitted on Briefs: July 26, 2001

Decided: November 21, 2002

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating

Rules, the following decision shall not be cited as precedent.  The decision shall be filed as a public

document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court

cause number, and result to the State Reporter Publishing Company and to West Group in the

quarterly table of noncitable cases issued by this Court.

¶2     Ronald McGinnis sued the City of East Helena and its former mayor, Larry Moore, for

retaliatory discrimination; negligent and intentional infliction of emotional distress; breach of

contract; and wrongful discharge relating to McGinnis's termination from employment as chief of

police.  The First Judicial District Court, Lewis and Clark County, granted summary judgment in

favor of the City and Moore.  We affirm.

¶3      We restate the issues raised by McGinnis on appeal as follows:

¶4     1. Whether the District Court erred by granting summary judgment on the issues of breach
of contract; wrongful discharge; and negligent and intentional infliction of emotional distress.

¶5     2. Whether the District Court erred by concluding that McGinnis waived his right to an
appeal before the police commission by failing to submit a written appeal when evidence showed
what Moore told McGinnis that an appeal was not available.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶6     Ronald McGinnis served as the chief of the East Helena police force from 1982 until his

discharge from employment in September 1995.  During this period, the East Helena police

department consisted of four full-time officers.  To provide round-the-clock coverage, each 24-hour

period was divided into three 8-hour shifts, with one officer assigned to each shift.   As the chief,

McGinnis worked the 7:00 a.m. to 3:00 p.m. shift and usually was the only officer on duty during

2

those hours.  Part-time, reserve officers filled in as needed to cover vacation and sick leave.

¶7      Medical problems plagued McGinnis during the last years of his employment with the City. As McGinnis described in his application for disability retirement benefits, which was approved in December 1995, he had surgery on his left shoulder in 1990; knee replacement surgery in 1993; a bleeding ulcer; and a life-threatening staph infection.  These infirmities required him to adjust his work schedule and to take an extended medical leave.  For example, following the knee surgery in November 1993, McGinnis worked part-time for a few months and resumed a full-time schedule for only a few weeks before cutting back to part-time duty again.  From July 1994 until January 1995, McGinnis worked full-time, but then his doctor advised him to stop working completely to allow his knee to recover.  The City granted McGinnis a six-month medical leave beginning in February 1995. While McGinnis received no salary during the leave, the City continued to pay his health insurance premiums.

¶8      In July 1995, as the end of the medical leave approached, McGinnis and his attorney met with Mayor Larry Moore and Michael Rieley, the East Helena city attorney.  McGinnis informed Moore and Rieley that the doctor again advised him not to return to full-time police work.  Declaring that he was physically unable to perform the full duties of the chief of police, McGinnis explained that he did not want to put himself, the public or another police officer at risk.  He requested the City relieve him of patrol duty and restrict his work to the administrative tasks of the police chief position, which he estimated would take about five hours each day to accomplish.  McGinnis's attorney sent Rieley a follow-up letter formally requesting that the City "allow Ron to work on a part time basis doing principally administrative type work for the City."  The letter enumerated various tasks that McGinnis could perform which required little physical exertion.

3

¶9 The minutes of the City Council meeting on September 19, 1995, reveal that the Council understood McGinnis to request a reconfigured chief of police position, entailing a five-hour shift per day consisting solely of administrative duties. The Council recognized that the new description of the police chief's duties that McGinnis sought would require the City to hire another officer to handle the patrol duties during McGinnis's shifts. At the Council meeting, McGinnis reiterated that he could no longer physically manage the patrolman functions of the job. The Council voted 3-1 to reject McGinnis's proposal to redefine the chief of police position and established September 25, 1995, as the date for McGinnis's formal termination from City employment. Two members of the East Helena police commission resigned to protest McGinnis's termination and numerous East Helena citizens signed a petition in support of McGinnis's reinstatement.

¶10 Through his attorney, McGinnis notified City Attorney Rieley in early October that he expected to be reinstated to an administrative position with the City "by October 19, 1995, or an action will be filed against the City and most of the members of the City Commission." At its next meeting on October 17, 1995, the City Council established an *ad hoc* committee composed of two council members, the City's Equal Employment Opportunity officer and the remaining member of the police commission. The Council directed the committee to investigate whether a special accommodation could be found for McGinnis. McGinnis and his attorney were invited to attend the committee meeting but neither appeared.

¶11 Weighing the duties of the East Helena police chief against the information McGinnis had provided previously concerning his physical condition, the committee first determined that McGinnis could not perform certain essential functions of the position. Given the small size of the East Helena Police Department and the fact that only one officer was on duty at any given time, the

4

committee affirmed the Council's finding that creation of a part-time position encompassing only the administrative responsibilities of the police chief would require that the City hire at least one more full-time officer to cover day-time patrol duties. Due to the significant additional expense to the City, the committee concluded that creation of a new position tailored to McGinnis's physical limitations was not a reasonable accommodation. The City Council unanimously accepted the *ad hoc* committee's conclusions on November 21, 1995.

¶12 McGinnis initiated his action on September 24, 1998. He sued the City of East Helena and Larry Moore, the former mayor, in five counts. The claims encompassed allegations of retaliatory discrimination, including various claims under Title VII of the Civil Rights Act, the Americans With Disabilities Act, and provisions for certain injured Montana police officers, pursuant to §§ 7-32-4132 and 4136, MCA; as well as claims for negligent infliction of emotional distress; intentional infliction of emotional distress; breach of an employment contract; and wrongful discharge. After the close of discovery, the City and Moore moved for summary judgment on all counts, which the District Court granted on December 21, 2000. McGinnis seeks review of the summary dismissal on four of the five counts.

## STANDARD OF REVIEW

¶13 The standard of review for a grant of summary judgment is *de novo*. This Court will apply the same evaluation as the district court based upon Rule 56, M.R.Civ.P. The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264, 900 P.2d 901, 903. Once the moving party has established the absence of a genuine issue of material fact in light of the substantive law of the case, the burden shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine

5

issue does exist. *Bruner*, 272 Mont. at 264, 900 P.2d at 903. Having determined that a genuine issue of material fact does not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. *Bruner*, 272 Mont. at 264, 900 P.2d at 903.

## DISCUSSION

¶14    *Issue 1. Whether the District Court erred by granting summary judgment on the issues of breach of contract; wrongful discharge; and negligent and intentional infliction of emotional distress.*

¶15    McGinnis appeals for *de novo* review of summary judgment on four of the five counts raised in his Complaint. Although he presents a breach of contract claim as an issue for appeal, McGinnis entirely neglects to brief the matter. Our Rules of Appellate Procedure require the appellant to present argument with citations to authorities, statutes and the record in respect to each issue presented. Rule 23(a)(4), M.R.App.P. Failure to formulate arguments or locate authorities in support of a position on appeal is sufficient cause for this Court to decline to address the issue. *State v. Blackcrow*, 1999 MT 44, ¶ 33, 293 Mont. 374, ¶ 33, 975 P.2d 1253, ¶ 33. Consequently, we limit our discussion to the summary dismissal of the wrongful discharge and the two infliction of emotional distress claims.

*Wrongful Discharge from Employment*

¶16    McGinnis challenges the District Court's finding that he was not able to perform the patrolman functions of the police chief position. Contending that a genuine issue of material fact exists regarding his physical ability to have performed all job duties in September 1995, McGinnis argues that the court erred by not acknowledging this factual dispute. If McGinnis had the capacity to carry out all essential functions of the police chief job, McGinnis submits a legal question arises as to whether the discharge was for good cause, pursuant to § 39-2-904, MCA.

6

¶17 A discharge is wrongful under the Wrongful Discharge from Employment Act only if:

(a) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;

(b) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or

(c) the employer violated the express provisions of its own written personnel policy.

Section 39-2-904, MCA. "Good cause" for discharge is defined as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." Section 39-2-903(5), MCA.

¶18 The record is clear that the East Helena City Council discharged McGinnis because the Council believed McGinnis was unable to perform certain essential functions of the police chief position, specifically the day-time patrol duties. The Council formally considered McGinnis's request for reconfigured job duties when both McGinnis and his attorney were present on September 19, 1995. The minutes of that meeting reveal that McGinnis informed the Council that he could not manage the physical demands of patrol duty and asked for reassignment to an administrative position in order to accommodate his admitted physical limitations. Nothing in the record indicates that McGinnis ever retracted the statements he made before the Council or that he either asked or offered to resume performing the police chief's job on a full-time or full-duty basis at any time after the Council's decision not to redefine the duties of the position.

¶19 McGinnis fails to offer any evidence to support the hypothetical proposition that he was able to perform all essential police chief job functions at the time of his termination from employment. Similarly, he presents no evidence to indicate that his inability to physically handle patrol duty, which was the City Council's stated reason for discharging him, was not a valid reason; amounted to a mistaken interpretation of the facts; or constituted a pretext and not the honest reason for his

7

discharge. Consequently, we hold that McGinnis has not met his burden of demonstrating the existence of a genuine issue of material fact that would preclude summary judgment on the issue of wrongful discharge.

*Negligent and Intentional Infliction of Emotional Distress*

¶20     The Respondents first argue that McGinnis's claims for negligent or intentional infliction of emotional distress are barred by the Wrongful Discharge from Employment Act (WDEA). The WDEA "provides the exclusive remedy for a wrongful discharge from employment" and allows that "no claim for discharge may arise from tort or express or implied contract." Sections 39-2-902 and 913, MCA. In construing § 39-2-913, MCA, we have held that the section bars all claims arising from an asserted wrongful discharge based upon common law tort or express contract. *Kneeland v. Luzenac America, Inc*., 1998 MT 136, ¶ 27, 289 Mont. 201, ¶ 27, 961 P.2d 725, ¶ 27 (*citing Beasley v. Semitool, Inc*. (1993), 258 Mont. 258, 261, 853 P.2d 84, 86). Further explicating the bar, § 39-2-905(3), MCA, states: "There is no right under any legal theory to damages for wrongful discharge under this part for pain and suffering [or] emotional distress . . ." Hence, the WDEA disallows tort and contract claims arising from the discharge, but does not bar claims arising within the circumstances of employment separate and independent from the discharge. *Beasley*, 258 Mont. at 262, 853 P.2d at 86. Therefore, only to the extent that McGinnis's avowed emotional distress stems directly from his termination is his tort claim precluded by the WDEA.

¶21     In his deposition, McGinnis stated "I've never been fired from a job in my life." His testimony continued,

> I took pride in my work. I feel like a, and I think I said this in a television interview,
>
> I felt like a race horse that as long as I was good and at the top and okay, I was fine;

8

but as soon as I wasn't able to be a hundred percent, why, I was just a piece of meat,

get rid of me."

By affidavit, McGinnis further asserted that the "mayor harassed me over the course of several years . . . ridiculed me about my health and my physical condition. He made fun of me in front of others. He embarrassed and humiliated me."

¶22    First, pursuant to § 39-2-913, MCA, we must exclude from consideration the distress McGinnis experienced as a result of the City's decision to terminate his long-term employment. McGinnis's lawful discharge as the East Helena chief of police and the concomitant loss of income and status exacted a psychic toll that our law does not recognize as compensable within the context of the tort claims of negligent and intentional infliction of emotional distress arising out of a wrongful discharge. Therefore, we confine our analysis to the acts of harassment McGinnis attributed to Moore as the source from which the emotional distress claims arise.

¶23    In *Sacco v. High Country Independent Press, Inc.* (1995), 271 Mont. 209, 896 P.2d 411, this Court held that an independent cause of action for negligent or intentional infliction of emotional distress arises under circumstances where serious or severe emotional distress to the plaintiff was the reasonably foreseeable consequence of the defendant's negligent or intentional act or omission. *Sacco*, 271 Mont. at 234 and 237, 896 P.2d at 426 and 428. We defined "serious" emotional distress as follows:

>    Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where

9

it is extreme that the liability arises. Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity.

*Sacco*, 271 Mont. at 234, 896 P.2d at 426 (*quoting* Restatement (Second) of Torts, § 46, comment j). We also delineated the respective roles of the court and the jury in deciding emotional distress cases as follows:

> It is for the court to determine whether on the evidence severe [serious] emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.

*Sacco*, 271 Mont. at 233, 896 P.2d at 425 (*quoting* Restatement (Second) of Torts, § 46, comment j). In other words, the district court must determine first whether the evidence supports a finding of severe emotional distress. *St. John v. Missoula Elec. Co-op., Inc.* (1997), 282 Mont. 315, 321, 938 P.2d 586, 589 (citing *Sacco*, 271 Mont. at 239, 896 P.2d at 429). Only when the court concludes the evidence supports a threshold finding of distress at a level of severity defined in *Sacco* does a jury or judge then determine whether the plaintiff suffered such distress.

¶24   A district court's determination of whether the objective circumstances of a case present a level of emotional distress that meets the *Sacco* definition of severity is a mixed question of law and fact. Our standard of review of a conclusion of law on a mixed question of law and fact is whether the determination is correct. *Butterfield v. Sidney Public Schools*, 2001 MT 177, ¶ 38, 306 Mont. 179, ¶ 38, 32 P.3d 1243, ¶ 38 (citing *Maquire v. State* (1999), 254 Mont. 178, 182, 835 P.2d 755,

10

757-58). Measuring this element requires a careful consideration of the circumstances under which the infliction occurs and the relationship of the parties involved in order to determine when and where a reasonable person should or should not have to endure certain kinds of emotional distress. *Maloney v. Home and Investment Center, Inc.,* 2000 MT 34, ¶ 63, 298 Mont. 213, ¶ 63, 994 P.2d 1124, ¶ 63.

¶25    The District Court, in this case, found that "a reasonable person could likely endure the type of harassment alleged by McGinnis" and that the distress McGinnis experienced was of the "transient or trivial" type that is a part of the cost of living with people.  The court also noted that there is no evidence in the record that McGinnis suffered any actual mental damage as a result of Moore's actions.

¶26    While the question of whether McGinnis actually suffered severe emotional distress is a separate inquiry to be undertaken by a jury subsequent to the court's determination that the evidence supports a finding of severe emotional distress, mental anguish that requires psychological treatment and results from inflicted emotional distress might well support such a finding.  McGinnis asserts that the District Court ignored testimony that he has taken anti-depressant medication and has remained under the care of a psychiatrist since his 1993 knee surgery due to Moore's harassment.

¶27    The following exchange occurred during McGinnis's deposition:

Q. [Attorney for Respondents] Did you seek medical help for this emotional distress?

A. [McGinnis] Yes, I did.

Q.  Who did you see?

A.  I first seen Dr. Samply.  I talked to Dr. Hunter.  I was in the hospital, and Dr. Hunter brought in Dr. Samply.

Q. What kind of doctor is he?

11

A.  Psychiatrist.

Q.  When was this?

A.  This was in November of '94, '93.

Q.  This was when you were still --

A.  When I had my knee replaced.

Q.  When you were still working there [at the police department]?

A.  Yeah, it was when I had my knee replacement.  I was on the verge of a breakdown.

Q.  Because of your knee replacement?

A.  No, because of all the things that had been happening to me, the injuries, the harassment.

Q.  What harassment?

A.  The things that I've told you about.

Q.  Those three incidents?

A.  That's all I remember off the top of my head.  There were more than that . . .

¶28     The three acts of harassment McGinnis described in his deposition include Moore making disparaging remarks about McGinnis's weight and calling him a "fat S.O.B."; challenging McGinnis to ride a bicycle; and telling another officer that McGinnis "was just an accident looking for a place to happen."  By affidavit, McGinnis submitted a hand-written list of other incidents of harassment perpetrated by Moore between November 1993 and September 1995.  After McGinnis returned to work following surgery and had to reduce his daily working hours from eight to five on his doctor's advice, Moore allegedly accused him of exaggerating his infirmities and pressured him to return to full-time status by threatening to demote him from the chief position.  McGinnis also claimed that

12

Moore threatened to refuse to sign his paychecks if McGinnis assigned a reserve officer more than eight hours of duty during any two-week pay period. McGinnis reported that Moore harassed him privately by blowing cigarette smoke into his car and commenting that "there's not much to hurt up there anyway" after McGinnis accidentally bumped his head. Publicly, Moore humiliated him by saying at an office party: "Hey, McGinnis, you don't need to eat that--your stomach is big enough already." Although Moore denied some of these alleged acts, this Court will presume the allegations to be true for our review on summary judgment.

¶29    Do such threats and insults inflict "serious and severe" emotional distress? According to McGinnis's recounting, the incidents occurred sporadically over a two-year period and, thus, did not constitute an intense barrage. Threats of demotion and wage withholding appear to have been idle, one-time events. The relationship between the parties is an important consideration, especially to decipher the meaning of ridicule or sarcasm when taken out-of-context and reduced to writing. Moore re-appointed McGinnis as the chief of police while McGinnis was on medical leave following his knee surgery in 1993. McGinnis testified that he and Moore were "very friendly" a year later in November 1994 but that "things had begun to deteriorate." The record does not reveal when Moore's needling lost its humor. McGinnis testified that he sought psychiatric help in 1993, in part, because of the harassment by Moore. However, he presented no evidence to connect his psychological treatment to underlying causes related to the alleged harassment. Consequently, while Moore may have behaved in a manner inconsiderate and unkind, we are not persuaded that he created severe distress that was the source of McGinnis's psychiatric condition.

¶30    We have observed that "there is no occasion for the law to intervene in every case where some one's feelings are hurt." *Maloney*, ¶ 66 (*quoting* Restatement (Second) of Torts, § 46,

13

comment d). We conclude that McGinnis did not meet his burden of demonstrating that the enumerated threats and insults engendered the type of "serious and severe" emotional distress that warrants legal redress.

¶31 We hold that the District Court completed an appropriate evaluation of the evidence to determine whether severe emotional distress could be found and, finding none, correctly dismissed McGinnis's claims of negligent or intentional infliction of emotional distress as a matter of law for want of a *prima facie* showing.

¶32 *Issue 2. Whether the District Court erred by concluding that McGinnis waived his right to an appeal before the police commission by failing to submit a written appeal when evidence showed what Moore told McGinnis that an appeal was not available.*

¶33 McGinnis testified that Moore told him that his termination was final and that an appeal to the East Helena police commission was useless. McGinnis maintains that it was reasonable for him to believe that he had no right to bring an appeal before the police commission due to Moore's superior position as the City's chief law enforcement officer. The District Court found that McGinnis, as the chief of police, was in a position to know that he nevertheless had a statutory right to appeal his discharge to the commission. Because McGinnis did not submit a written appeal, the court concluded that he failed to exercise his right to a hearing before the police commission. McGinnis claims that he was denied his right to appeal the City's failure to consider an alternative work schedule for him and his termination due to Moore's inaccurate statement.

¶34 Section 7-32-4151, MCA, requires every city to have a police commission. A member of the police force who is disciplined, suspended, removed, or discharged has a right of appeal to the police commission. Section 7-32-4164, MCA. The commission's duty is to hear and decide appeals, § 7-32-4155(1), MCA, and it has the power to sustain, modify, or overrule a disciplinary order of the

14

mayor, § 7-32-4160, MCA. The following procedure is required to bring an appeal:

> An appeal brought by any member of the police force must be in writing in the form required by the police commission, and a copy must be served upon the mayor, city manager, or chief executive at least 30 days before the time fixed for the hearing of the appeal.

Section 7-32-4156, MCA.

¶35    McGinnis argues that his employer's inaccurate statement that an appeal to the police commission was useless relieved him of his obligation to comply with the requirements of § 7-32-4156, MCA. However, he cites no authority for his conclusion, nor does he explain why he, as the chief of police, should not be held to know the requirements of this law--one which pertains specifically to his job. Moreover, at the time when the City Council discharged him from employment, McGinnis was represented by counsel, who was in a position to advise him regarding his legal rights.

¶36    In passing, we note that we have held that an employer is not shielded from a wrongful discharge suit by a provision of the WDEA that requires exhaustion of internal grievance procedures prior to filing a district court action when the employer fails to provide the employee with a written copy of the internal procedures in a timely manner. *Casiano v. Greenway Enterprises, Inc.,* 2002 MT 93, ¶ 21, 309 Mont. 358, ¶ 21, 47 P.3d 432, ¶ 21. *See also Eadus v. Wheatland Memorial Hospital & Nursing Home* (1996), 279 Mont. 216, 222, 926 P.2d 752, 756; §§ 39-2-911(2) and (3), MCA. Notwithstanding, even if the statutorily prescribed procedure set out in Title 7, Ch. 32, part 41, MCA, is deemed to be an internal grievance procedure for purposes of § 39-2-911(2) and (3), MCA--and we do not decide that question here--McGinnis did not make that argument in the trial court nor does he make that argument on appeal. Indeed, he fails to cite either *Casiano* or *Eadus* for any purpose.

15

¶37    In short, McGinnis has failed to advance any legal argument demonstrating why the trial court should be reversed.  Again, it is not this Court's obligation to conduct legal research on an appellant's behalf, to guess as to his precise position, or to develop legal analysis that may lend support to his position. *In re Marriage of Snow*, 2002 MT 143, ¶ 28, 310 Mont. 260, ¶ 28, 49 P.3d 610, ¶ 28 (citations omitted).  We reiterate that failure to comply with Rule 23(a)(4), M.R.App.P., is fatal to an appeal. *Blackcrow*, ¶ 33.

¶38    In summary, § 7-32-4164, MCA, provides that a member of a police force may appeal to a local police commission for redress.  Because § 7-32-4156, MCA, unambiguously mandates that an appeal to a police commission must be brought in writing, in the absence of McGinnis advancing any persuasive argument or authority to the contrary,  it is our obligation to apply the statute as written.  Accordingly, we affirm the District Court's conclusion that McGinnis was not denied a right to an appeal but rather, by failing to submit a  written appeal to the police commission, he neglected to exercise that right.

### CONCLUSION

¶39    We hold that the District Court correctly dismissed McGinnis's claims and we affirm the grant of summary judgment in favor of the City and the former Mayor of East Helena.

¶40    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ TERRY N. TRIEWEILER
/S/ PATRICIA COTTER
/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART

16