FILED

11/30/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0116

DA 21-0116

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 308

PF2 LEASING, LLC,

       Intervenor and Appellant,

  v.

JIM GALIPEAU,

       Receiver and Appellee.

APPEAL FROM:    District Court of the Fourth Judicial District,
                    In and For the County of Missoula, Cause No. DV-18-1450
                    Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

       Dustin M. Chouinard, Markette & Chouinard, P.C., Hamilton, Montana

       For Appellee:

       Donald C. St. Peter, Michael O'Brien, Logan Nutzman, St. Peter Law
       Offices, P.C., Missoula, Montana

                           Submitted on Briefs:  September 22, 2021

                                 Decided:  November 30, 2021

Filed:

_____
                Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     PF2 Leasing, LLC, (PF2) appeals from the Special Master's Determination in the Fourth Judicial District Court, Missoula County, that resolved a dispute between PF2 and Jim Galipeau, Receiver for Black Gold Enterprises, LLC, (Black Gold). We affirm in part and reverse in part.

¶2     We restate the issues on appeal as follows:

*1. Did the Special Master exceed the scope of his authority by applying the theory of judicial immunity to the Receiver's possession and release of PF2's equipment?*

*2. Did the Special Master err in concluding that the Receiver shares the District Court's immunity from liability?*

*3. Did the Special Master exceed the scope of his authority when he concluded that the Receiver acted in good faith and within his court-appointed authority in taking and retaining possession of PF2's property?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3     Black Gold rents real property to commercial tenants. It was formed as a member-managed limited liability company (LLC), with its members—Joshua T. Patterson, Adam Pummill, and Kurtis Robertson—each having an equal interest. In addition to being one of the LLC members, Patterson also owned and operated several businesses that were Black Gold's tenants. Patterson became involved in a dispute with Pummill and Robertson over the tenancies, culminating in the litigation that underlies the matter on appeal.

¶4     On August 22, 2019, the District Court granted Pummill and Robertson's motion for the appointment of a receiver for Black Gold. The court appointed Galipeau, granting

2

him the powers enumerated in § 27-20-302, MCA[1], and ordering him to "marshal, preserve, protect, maintain, manage and safeguard the Assets of Black Gold Enterprises, LLC in a reasonable, prudent, diligent, and efficient manner."[2]  Galipeau filed his Oath of Receivership on September 9, 2019.

¶5     On March 13, 2020, the District Court ordered Patterson and his businesses to vacate the Black Gold premises immediately.  The next day, and without further notice, Galipeau changed the locks on the building.

¶6     On April 29, 2020, Galipeau moved the District Court for an order adopting a process to allow third parties to reclaim personal property that remained within Black Gold's building.  Galipeau wanted to ensure that the property was returned to the rightful owner and "to limit the potential liability to the Receiver in regards to this property[.]"  This motion was apparently spurred by a letter Galipeau received from PF2's counsel on April 24, 2020, that demanded release of personal property located within Black Gold's building that allegedly belonged to PF2, an LLC owned by Mark and Reid Fournier.  Galipeau informed the court that he had received a copy of an Agreement for Sale and Purchase reflecting a sale of this property from Patterson to Mark Fournier, but no evidence that the sale had been completed, that the sale was undertaken at arm's

---

[1] The receiver has, under the control of the court, the power to:
(1) bring and defend actions in the receiver's own name, as receiver;
(2) take and keep possession of the property;
(3) receive rents, collect debts, and compound for and compromise the rents and debts;
(4) make transfers; and
(5) generally do acts respecting the property that the court may authorize.

[2] This Court affirmed the District Court's appointment of a receiver in the underlying dispute. *Pummill v. Patterson*, No. DA 19-0124, 2019 MT 265N, 2019 Mont. LEXIS 741.

3

length, or that PF2 currently had title to the property. Thus Galipeau asked the court to require PF2 to provide copies of cancelled checks for the purchase price of the property, along with bills of sale, proof of ownership, and copies of any leases existing between PF2 and Patterson or any of Patterson's business entities.

¶7 On May 13, 2020, Patterson responded to Galipeau's motion, asserting that Galipeau inappropriately refused to release personal property to third parties unless the parties agreed that he be held harmless. Patterson argued Galipeau had no legal justification for refusing to return property to third parties and no basis to condition the return of property on the execution of a hold-harmless agreement.

¶8 In reply, Galipeau argued that he became an involuntary bailee of the personal property when he took possession of Black Gold's premises. Galipeau asserted that when he took possession, he did not know who owned the property at issue, he was not obligated to return it until the owner made a demand, and once a demand was made he had "some obligation" to ascertain the rightful owner. Galipeau further asserted that PF2's demand, through its attorney, was accompanied by a Verified Complaint alleging conversion by the Receiver. Galipeau, through counsel, then requested that PF2 provide verification of its ownership, but PF2 instead provided evidence that the property was owned by Mark Fournier personally. Galipeau considered this a potential competing claim of ownership and he requested further documentation. After PF2 provided additional documentation, Galipeau agreed to release the property to PF2 contingent upon PF2 signing a release of liability, which PF2 refused to do. Galipeau acknowledged that he still possessed the disputed property as he and PF2 had reached an impasse. He argued that a

4

release was necessary to protect him from claims beyond the scope of liability as an involuntary bailee.

¶9    On May 18, 2020, PF2 moved to intervene in Cause No. DV-18-1450 for the limited purpose of seeking an order requiring Galipeau to return PF2's personal property. PF2 then filed an amended motion to intervene on May 20, 2020.

¶10    On September 18, 2020, the District Court granted PF2's motion to intervene for the limited purpose of seeking an order requiring Galipeau to return PF2's property. The court further filed PF2's Motion and Brief for Order to Return Property, which PF2 had attached to its amended motion to intervene. In its combined motion and brief, PF2 argued for the immediate return of its property in Galipeau's possession "without condition."

¶11    In response to PF2's motion for return of property, Galipeau asserted, "The Receiver has received sufficient documentation from PF2 to determine that PF2 and/or Mark Fournier have a claim of ownership which allows the Receiver to release the subject property to them subject to an indemnification from PF2 and Mark Fournier." Galipeau further asserted, "[T]he sole impediment to the Receiver allowing PF2 to remove personal property from the Black Gold property has been PF2 and Mark Fournier's refusal to release the Receiver from the claims set forth in the verified complaint it delivered to the Receiver." Galipeau argued that it was reasonable for him to request a release because PF2 had threatened him with litigation. In reply, PF2 asserted that Galipeau had offered no legal authority to support his refusal to return PF2's property only on the condition that PF2 release him from liability.

5

¶12 After briefing was completed, Galipeau requested a hearing on both his Motion for Order Adopting Receiver's Process and PF2's Motion and Brief for Order to Return Property. PF2 objected to the need for hearing on the motions.

¶13 On October 27, 2020, the District Court denied Galipeau's request for a hearing on the motions. In its Order Denying Receiver's Request for Hearing and Order Appointing Special Master on Limited Issue, the court framed the dispute between PF2 and Galipeau as "disagreement between the Receiver and PF2 over the ownership of the property at issue and/or method of return." The court then ruled as follows:

> The Court finds that there are competing claims regarding the disputed property and the terms of return. In the best interest of the parties and efficient use of judicial resources, a special master shall be appointed to resolve the limited issue of the return of PF2's property and other issues as outlined in the Receiver's Motion for Order Adopting Receiver's Process (ROA 172)[3] and PF2's Motion for Order to Return Property (ROA 246).

¶14 The court ultimately appointed attorney Kevin S. Jones as Special Master. In its December 8, 2020 Order Appointing Special Master, the court ruled:

> Mr. Kevin Jones is appointed Special Master to resolve the disputes regarding the property located on Black Gold's premises between the Receiver and Intervenor PF2 Leasing, LLC, including Intervenor's *Motion and Brief for Order to Return Property* (Dckt. # 246) and Receiver's *Motion for Order Adopting Receiver's Process for Reclaiming Personal Property* (Dckt. # 156). Mr. Jones shall have all duties and powers granted to a Special Master under Mont. R. Civ. P. 53(c)(2).

¶15 Finally, on December 18, 2020, the court issued its Order Regarding Receiver's Motion for Order Submitting All Outstandning [sic] Motions to the Special Master, in

---

[3] The Receiver's Motion for Order Adopting Receiver's Process is docketed in the District Court record as Item No. 156. The District Court corrected this error in subsequent orders.

6

which it reiterated its earlier ruling and added resolution of an additional dispute to the Special Master's scope of authority:

> On December 8, 2020, and based upon written agreement by the parties, the Court appointed Keven [sic] Jones as Special Master to resolve the disputes regarding the property located on Black Gold's premises between the Receiver and Intervenor PF2 Leasing, LLC, including the Intervenor's Motion and Brief for Order to Return Property (Dkt. 246) and Receiver's Motion for Order Adopting Receiver's Process for Reclaiming Personal Property (Dkt. 156). . . . In the interest of judicial economy, the Court finds that Defendants' Motion for Leave to File Sur-Reply to Address the Receiver's Reply in Support of Motion for Order Adopting Receiver's Process (Dkt. 175) as well as any scheduling issues that may be agreed to by the parties as outlined in Defendants' Motion to Amend the Scheduling Order and Request for Scheduling Conference (Dkt. 181) are additional preliminary motions that may be resolved by the Settlement [sic] Master.

¶16    On February 8, 2021, Jones issued the Special Master's Determination that is the subject of this appeal.  In the Determination, he found that PF2 had provided evidence that it owned the property at issue and no one else had claimed ownership of it.  Jones did not rely on Galipeau's bailment theory.  Instead, he relied on the theory of judicial immunity, ruling that Galipeau did not need a release or indemnification agreement from PF2 to surrender those items to PF2 because he was "immune from personal liability as a ministerial officer of the Court."  The Special Master concluded:

> The Receiver does not have any personal liability to PF2, or to any other third party, in relation to that equipment, or as the result of the release of the equipment to PF2. The District Court's immunity from liability is shared by the Receiver and would apply to any claims against the Receiver in relation to the Receiver's possession or release of the subject equipment.

7

¶17 On February 8, 2021, PF2 filed objections to the Special Master's Determination in the District Court. However, PF2 filed its Notice of Appeal in this Court prior to the District Court ruling on its objections.[4]

## STANDARDS OF REVIEW

¶18 Section 3-5-113(1)(c), MCA, specifies that any order, judgment, or decree made by a special master has the same force and effect "as if made . . . by the district court with the regular judge presiding." Therefore, the only procedure by which to obtain review of that special master's decision is by direct appeal to this Court. *PF2 Leasing, LLC v. Galipeau*, 2021 MT 93, ¶ 6, 404 Mont. 53, 485 P.3d 188. As such, this Court applies the same standards of review to a special master's report as it would to any other district court order. *Maloney v. Home & Inv. Ctr., Inc.*, 2000 MT 34, ¶ 28, 298 Mont. 213, 994 P.2d 1124.

¶19 We review a district court's legal conclusions for correctness. Whether a district court has jurisdiction to rule on a matter is a question of law which we review to determine whether the district court had authority to act. A court exceeds jurisdiction through acts which exceed the defined power of a court, whether that power be defined by constitutional provisions, express statutes, or rules developed by the courts. *Southwest Mont. Bldg. Indus. Ass'n v. City of Bozeman*, 2018 MT 62, ¶ 20, 391 Mont. 55, 414 P.3d 761 (citations omitted).

---

[4] See *PF2 Leasing, LLC v. Galipeau*, 2021 MT 93, 404 Mont. 53, 485 P.3d 188, in which we concluded that this matter is properly before us on appeal.

¶20    Immunity is a legal conclusion. *Smith v. Butte-Silver Bow County*, 266 Mont. 1, 15, 878 P.2d 870, 878-81 (1994) (Nelson, J., concurring).   It is therefore reviewed for correctness. *Southwest Mont. Bldg. Indus. Ass'n*, ¶ 20.

**DISCUSSION**

¶21    *1. Did the Special Master exceed the scope of his authority by applying the theory of judicial immunity to the Receiver's possession and release of PF2's equipment?*

¶22    Both PF2 and Galipeau agree that the theory of judicial immunity was not raised by any party.  However, they disagree as to whether the Special Master acted within the scope of the authority the District Court granted to him when he concluded that Galipeau, in his role as court-appointed Receiver, was protected by judicial immunity.

¶23    Under M. R. Civ. P. 53(c)(1), a court may specify or limit a special master's powers. Once a special master is appointed to try a matter under § 3-5-113, MCA, that cause which the special master is appointed to decide is no longer "to be tried by the court" that appointed the special master. *PF2*, ¶ 17.  PF2 argues that the Special Master exceeded his authority when he ruled that Galipeau, as a court-appointed receiver, was protected by judicial immunity.  Galipeau responds that the Special Master acted within the scope of his authority by acknowledging that under Montana law, court-appointed receivers are agents of the judiciary and are thus entitled to judicial immunity.

¶24    As set forth above, the District Court issued three orders that define the scope of the authority it granted to the Special Master.  Those orders indicate that the court intended the Special Master's scope of authority to include issues raised by PF2 and Galipeau in specific filings, including Galipeau's Motion for Order Adopting Receiver's Process for

9

Reclaiming Personal Property and Brief in Support, docketed as Item No. 156 in the District Court record, and PF2's Motion and Brief for Order to Return Property, docketed as Item No. 246. We therefore consider the contents of those documents in determining whether the Special Master's determinations fell within the Special Master's authority.

¶25 In the Motion for Order Adopting Receiver's Process for Reclaiming Personal Property and Brief in Support, Galipeau proposed a process for returning personal property and he requested the District Court's approval. In part, Galipeau proposed that each person requesting recovery of personal property provide certain documentation, including "an agreement to hold the Receiver harmless and indemnifies the Receiver from any claims by any other person or entity regarding the property being retrieved[.]" In PF2's Motion and Brief for Order to Return Property, PF2 requested from the court "an order directing the Receiver to return PF2's property without condition[.]" These two filings clearly indicate that the necessity for a release from liability was a dispute between PF2 and Galipeau and that the District Court intended the resolution of this dispute to be within the scope of authority it granted the Special Master.

¶26 In the Determination, the Special Master outlined the dispute between PF2 and Galipeau, noting that Galipeau, as Receiver, took possession of certain equipment when he took control of Black Gold's real property. PF2 later claimed ownership of that equipment and, after Galipeau demanded that PF2 prove ownership, PF2 provided Galipeau with a copy of a sale and purchase agreement for the equipment. Galipeau then moved the District Court for an order adopting his proposed process for returning personal property. The Special Master noted that Galipeau specifically asked the court to require PF2 to

10

provide further proof of ownership and "an agreement to hold harmless and indemnify the Receiver from any claims of other persons or entities in relation to the equipment"—a requirement to which PF2 objected. The Special Master further explained, "PF2 threatened to sue the Receiver for conversion, causing the Receiver to then also demand a release of all claims from PF2 prior to surrendering possession of the personal property claimed by PF2. PF2 claims that Montana's property statutes require the Receiver to immediate[ly] surrender its equipment, without condition."

¶27 The Special Master then determined that Galipeau should release the equipment to PF2 without requiring a release or indemnification agreement from PF2 because Galipeau shared the District Court's immunity from liability. This determination was within the scope of the authority the District Court granted to the Special Master because these disputes—whether the Receiver should release the equipment claimed by PF2 and whether PF2 should be required to provide a release or indemnification agreement—were set forth in the referenced filings.

¶28 While no party raised the question of whether Galipeau was entitled to immunity, it would make little sense to define the Special Master's scope of authority as including the dispute about the necessity for a release, but excluding the Special Master's reasoning for his conclusion. Nothing in the District Court orders limited the legal theories upon which the Special Master could rely and we therefore conclude he did not err in considering whether judicial immunity applied to the Receiver.

11

¶29  *2.  Did the Special Master err in concluding that the Receiver shares the District Court's immunity from liability?*

¶30  Because we have concluded that the Special Master acted within the scope of his authority when he concluded that Galipeau, in his role as a court-appointed receiver, is protected by judicial immunity, we further must determine if the Special Master's conclusion is correct.

¶31  A court-appointed receiver is an agent of the court whose only authority is that which has been conferred by the appointing court. *Parcells v. Price*, 110 Mont. 537, 540, 104 P.2d 12, 13 (1940) (citations omitted).  Finding Montana caselaw "limited" on the issue of receivers' authority, the Special Master cited *Parcells* and further turned to treatises to reach his conclusion.  Although PF2 does not overtly disagree that a court-appointed receiver may be protected by judicial immunity, we recognize, as the Special Master did, that little Montana case law speaks to whether a receiver has judicial immunity.  Galipeau asserts that the case law is silent because a receiver's judicial immunity is axiomatic; since a receiver is an agent of the court, a receiver is entitled to judicial immunity for acts taken in good faith and within the authority conferred upon him.

¶32  While a receiver's entitlement to judicial immunity is perhaps not "axiomatic," Galipeau is correct that when the question of judicial immunity for receivers has arisen, courts have generally concluded that receivers are protected.  In *New Alaska Dev. Corp. v. Guetschow*, 869 F.2d 1298 (9th Cir. 1989), the Ninth Circuit Court of Appeals concluded that Guetschow, who was appointed by the Alaska Superior Court to assume the business

12

affairs of a spouse who was party to a divorce proceeding, was entitled to judicial immunity. The court explained:

> While our cases have not directly addressed the immunity due a receiver appointed by a state court to manage the business assets of a marital estate during a dissolution proceeding, their rationale teaches that absolute derivative judicial immunity is appropriate. Moreover, cases from other circuits have held uniformly that state court-appointed receivers are entitled to absolute immunity.

*Guetschow*, 869 F.2d at 1303 (citations and internal quotations omitted). However, as *Guetschow* further holds, absolute immunity extends only to the performance of judicial tasks; acts in the absence of jurisdiction—such as, in Guetschow's case, accusations of theft and slander—are not judicial acts. *Guetschow*, 869 F.2d at 1304-05.

¶33 *Guetschow* appears consistent with courts' general approach to receivers' entitlement to judicial immunity. According to 65 Am. Jur. 2d *Receivers* § 189 (Westlaw through Nov. 2021):

> Generally, a receiver has no personal liability for actions performed within the receiver's official capacity and within the scope of the receiver's authority pursuant to the receivership order. The receiver's obedience to the orders and directions of the appointing court assures that the receiver will not be held personally liable, even if the court order under which the receiver acts is erroneous and subsequently reversed. A receiver appointed by and acting on behalf of the court shares the court's immunity from personal liability. Like the court itself, the receiver's immunity from suit exists by virtue of the context in which the receiver acts, not the content of the receiver's actions. Judicial immunity only extends to a receiver who acts in good faith and with appropriate care and prudence, and does not extend to everything a receiver may do in the course of performing responsibilities or to every kind of lawsuit that might be filed against a receiver in an official capacity. A state court order will not provide immunity to the extent that the receiver must defend itself on the merits of whether it acted with reasonable business judgment if the receiver did not analyze risks inherent in various known options and bring risks to attention of court and parties for their consideration in the decision-making process.

13

¶34     In light of this persuasive authority, we conclude that the Special Master's ruling that Galipeau, in his role as court-appointed Receiver, is protected by judicial immunity is correct.

¶35     *3. Did the Special Master exceed the scope of his authority when he concluded that the Receiver acted in good faith and within his court-appointed authority in taking and retaining possession of PF2's property?*

¶36     PF2 further asserts that, even if the Special Master was within the scope of his authority when he determined that Galipeau, as a court-appointed receiver, is entitled to judicial immunity for actions taken "in good faith and within the authority conferred upon him," the Special Master exceeded that scope when he further concluded that Galipeau's actions in obtaining and retaining possession of PF2's property were undertaken in good faith and within his authority as Receiver.  PF2 argues that it was entitled to advance notice that the Special Master was considering granting immunity to Galipeau and that "the Special Master's grant of immunity ends in an [sic] sweeping, arbitrary and unjust result."  PF2 characterizes this ruling as preemptive:  Since neither party raised the question of judicial immunity, the Special Master's conclusion violates PF2's right to due process because it precludes PF2 from asserting that any of Galipeau's actions are *not* covered by judicial immunity.  Galipeau responds that the Special Master acted within the scope of his authority because the conclusion that Galipeau acted in good faith and within the authority of his appointment was part of the resolution of the dispute regarding PF2's property.

¶37     The distinction between this issue and Issue One is subtle but significant:  In Issue One, we concluded that the Special Master did not exceed the scope of his authority when he concluded that Galipeau, in his role as court-appointed Receiver, generally has

14

judicial immunity by virtue of the fact that he is the court-appointed Receiver in this case. Here, we consider PF2's argument that the Special Master exceeded his authority by *granting* immunity to Galipeau by determining that Galipeau's actions concerning PF2's property fall within the scope of that immunity. For the reasons set forth below, we conclude that the Special Master exceeded his authority in this instance.

¶38    To determine the scope of the Special Master's authority, we again look to the three District Court orders that define the scope of authority granted to the Special Master. These orders gave the Special Master the authority to resolve the "disputes regarding the property" as further set forth in specific filings. By the time the District Court appointed the Special Master, PF2 had proven ownership to Galipeau's satisfaction; the only dispute regarding the property was whether Galipeau could condition its return upon PF2 releasing Galipeau from liability.

¶39    The Special Master correctly concluded that Galipeau's actions as Receiver are generally protected by judicial immunity. He further correctly concluded that the protection afforded to Galipeau eliminated Galipeau's justification for withholding PF2's property in exchange for such a release. However, the issue of whether the specific actions Galipeau took regarding PF2's property were undertaken in good faith and within the authority of his appointment was not set forth as a dispute in the filings referenced by the District Court's orders referring the matter to the Special Master. In the present case, the District Court granted PF2 intervention for the limited purpose of seeking an order requiring Galipeau to return its personal property; any other claims PF2 may have,

15

including a conversion claim, are beyond the scope of its intervention here. Therefore, it was not within the scope of the Special Master's authority to make such determination.

¶40     In *Guetschow,* the Ninth Circuit recognized that while court-appointed receivers are protected by judicial immunity, they can nonetheless be subject to litigation for actions that are not a normal function of a court-appointed receiver or which exceed the scope of appointment. *Guetschow,* 869 F.2d at 1303-04 (citations omitted). *Guetschow* explains that a receiver would be "a lightning rod for harassing litigation" absent broad immunity and to prevent such harassment, a plaintiff is required to allege the absence of judicial immunity in order to pursue a claim against a receiver. *Guetschow,* 869 F.2d at 1303 (citations omitted). In this case, the Special Master was correct to order PF2's property returned without a release of liability because all appropriate actions taken by Galipeau as Receiver are protected by judicial immunity and therefore a release would be unnecessary. In his motion to the District Court for an order adopting a process for return of property, Galipeau asserted that the purpose of such request was, in part, "to limit the potential liability to the Receiver in regards to this property[.]" The protection afforded by judicial immunity accomplishes this goal without the necessity of a release of liability.

¶41     Because we have concluded the District Court did not grant the Special Master the authority to determine whether Galipeau acted in good faith and within the scope of his authority as Receiver in obtaining and retaining possession of PF2's personal property, we reverse and vacate that portion of the Special Master's Determination. Since this question was not properly before the Special Master, we need not consider PF2's arguments as to

16

why it believes Galipeau's actions concerning PF2's personal property should not be protected by judicial immunity.

**CONCLUSION**

¶42    We conclude the Special Master correctly concluded that a court-appointed receiver is protected by judicial immunity and that the Special Master acted within the scope of his authority when he determined that it was unnecessary for Galipeau to require a release or indemnification agreement to return PF2's personal property.  However, the Special Master exceeded the scope of his authority when he further granted Galipeau immunity for the actions Galipeau took regarding PF2's personal property.


                                                        /S/ LAURIE McKINNON

We concur:

/S/ MIKE McGRATH
/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ JIM RICE